## REPUBLIC STEEL CORP. *v.* MADDOX.

No. 43. Argued November 18, 1964.—Decided January 25, 1965.

*Samuel H. Burr* argued the cause for petitioner. With him on the brief were *Andrew J. Thomas* and *James R. Forman, Jr.*

*Richard L. Jones* argued the cause for respondent. With him on the brief were *John D. Prince, Jr.,* and *Edwin L. Brobston.*

*J. Albert Woll, Robert C. Mayer, Theodore J. St. Antoine* and *Thomas E. Harris* filed a brief for the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae,* urging reversal.

MR. JUSTICE HARLAN delivered the opinion of the Court.

Respondent Maddox brought suit in an Alabama state court against his employer, the Republic Steel Corporation, for severance pay amounting to $694.08, allegedly owed him under the terms of the collective bargaining

agreement existing between Republic and Maddox' union. Maddox had been laid off in December 1953. The collective bargaining agreement called for severance pay if the layoff was the result of a decision to close the mine, at which Maddox worked, "permanently." [1] The agreement also contained a three-step grievance procedure to be followed by binding arbitration,[2] but Maddox made no effort to utilize this mode of redress. Instead, in August 1956, he sued for breach of the contract. At all times material to his claim, Republic was engaged in interstate commerce within the meaning of the Labor Management Relations Act,[3] and Republic's industrial relations with Maddox and his union were subject to the provisions of that Act.

The case was tried on stipulated facts without a jury. Judgment was awarded in favor of Maddox, and the appellate courts of Alabama affirmed on the theory that state law applies to suits for severance pay since, with the employment relationship necessarily ended, no further danger of industrial strife exists warranting the application of federal labor law.[4] *Moore* v. *Illinois Cen-*

---

[1] The section of the contract dealing with severance allowance provided in relevant part:

"When, in the sole judgment of the Company, it decides to close permanently a plant or discontinue permanently a department of a mine or plant, or substantial portion thereof and terminate the employment of individuals, an Employee whose employment is terminated either directly as a result thereof because he was not entitled to other employment with the Company under the provisions of Section 9 of this Agreement—Seniority and Subsection C of this Section 14, shall be entitled to a severance allowance in accordance with and subject to the provisions hereinafter set forth in this Section 14."

[2] See *infra*, p. 658.

[3] 61 Stat. 136 (1947), as amended, 29 U. S. C. § 141 *et seq.* (1958 ed.).

[4] 275 Ala. 685, 158 So. 2d 492.

*tral R. Co.,* 312 U. S. 630 (1941), and *Transcontinental & Western Air, Inc.* v. *Koppal,* 345 U. S. 653 (1953), cases decided under the Railway Labor Act,[5] were cited to support the proposition. Furthermore, it was held that under Alabama law Maddox was not required to exhaust the contract grievance procedures. We granted Republic's petition for certiorari, 377 U. S. 904, to determine whether the rationale of *Moore* v. *Illinois Central R. Co.* carries over to a suit for severance pay on a contract subject to § 301 (a) of the Labor Management Relations Act.[6] We conclude that the state judgment must be reversed.

## I.

As a general rule in cases to which federal law applies, federal labor policy requires that individual employees wishing to assert contract grievances must *attempt* use of the contract grievance procedure agreed upon by employer and union as the mode of redress.[7] If the union refuses to press or only perfunctorily presses the individual's claim, differences may arise as to the forms of redress then available. See *Humphrey* v. *Moore,* 375 U. S. 335; *Labor Board* v. *Miranda Fuel Co.,* 326 F. 2d 172.[8] But

---

[5] 48 Stat. 1185 (1934), 45 U. S. C. § 151 *et seq.* (1958 ed.).

[6] See *infra,* p. 657.

[7] *Smith* v. *Evening News Assn.,* 371 U. S. 195, 196, n. 1 (by implication); *Belk* v. *Allied Aviation Service Co.,* 315 F. 2d 513, cert. denied, 375 U. S. 847; see Cox, Rights Under a Labor Agreement, 69 Harv. L. Rev. 601, 647–648 (1956). The proviso of § 9 (a) of the National Labor Relations Act, as amended, 29 U. S. C. § 159 (a) (1958 ed.), is not contra; *Black-Clawson Co.* v. *Machinists,* 313 F. 2d 179.

[8] See, *e. g.,* Summers, Individual Rights in Collective Agreements and Arbitration, 37 N. Y. U. L. Rev. 362 (1962); Cox, Rights Under a Labor Agreement, 69 Harv. L. Rev. 601 (1956); Note, Federal Protection of Individual Rights Under Labor Contracts, 73 Yale L. J. 1215 (1964).

unless the contract provides otherwise,[9] there can be no doubt that the employee must afford the union the opportunity to act on his behalf. Congress has expressly approved contract grievance procedures as a preferred method for settling disputes and stabilizing the "common law" of the plant. LMRA § 203 (d), 29 U. S. C. § 173 (d); § 201 (c), 29 U. S. C. § 171 (c) (1958 ed.). Union interest in prosecuting employee grievances is clear. Such activity complements the union's status as exclusive bargaining representative by permitting it to participate actively in the continuing administration of the contract. In addition, conscientious handling of grievance claims will enhance the union's prestige with employees. Employer interests, for their part, are served by limiting the choice of remedies available to aggrieved employees. And it cannot be said, in the normal situation, that contract grievance procedures are inadequate to protect the interests of an aggrieved employee until the employee has attempted to implement the procedures and found them so.

A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it. In addition to cutting across the interests already mentioned, it would deprive employer and union of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances. If a grievance procedure cannot be made exclusive, it loses much of its desirability as a method of settlement. A rule creating such a situation "would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Teamsters Local* v. *Lucas Flour Co.,* 369 U. S. 95, 103.

---

[9] See *infra,* pp. 657–658.

## II.

Once it is established that the federal rule discussed above applies to grievances in general, it should next be inquired whether the specific type of grievance here in question—one relating to severance pay—is so different in kind as to justify an exception. *Moore* v. *Illinois Central R. Co.,* and *Transcontinental & Western Air, Inc.* v. *Koppal, supra,* are put forward for the proposition that it is.

In *Moore,* the Court ruled that a trainman was not required by the Railway Labor Act to exhaust the administrative remedies granted him by the Act before bringing suit for wrongful discharge. MR. JUSTICE BLACK, for the Court, based the decision on the use of permissive language in the Act—disputes "may be referred . . . to the . . . Adjustment Board . . . ." [10] MR. JUSTICE BLACK wrote again in *Slocum* v. *Delaware, L. & W. R. Co.,* 339 U. S. 239 (1950), a declaratory judgment suit brought in a state court by a railroad company against two unions to resolve a representation dispute. The Court held that jurisdiction of the Adjustment Board to resolve such disputes was exclusive. *Moore* was distinguished thus:

> "Moore was discharged by the railroad. He could have challenged the validity of his discharge before the Board, seeking reinstatement and back pay. Instead he chose to accept the railroad's action in discharging him as final, thereby ceasing to be an employee, and brought suit claiming damages for breach of contract. As we there held, the Railway Labor Act does not bar courts from adjudicating such cases. A common-law or statutory action for wrongful discharge differs from any remedy which

---

[10] 45 U. S. C. § 153 (i) (1958 ed.).

the Board has power to provide, and does not involve questions of future relations between the railroad and its other employees." 339 U. S. 239, at 244.

This distinction was confirmed in *Transcontinental & Western Air, Inc.* v. *Koppal, supra:*

"Such [a wrongfully discharged] employee may proceed either in accordance with the administrative procedures prescribed in his employment contract or he may resort to his action at law for alleged unlawful discharge if the state courts recognize such a claim. Where the applicable law permits his recovery of damages without showing his prior exhaustion of his administrative remedies, he may so recover, as he did in the *Moore* litigation, *supra,* under Mississippi law." [11] 345 U. S. 653, at 661.

Federal jurisdiction in both *Moore* and *Koppal* was based on diversity; federal law was not thought to apply merely by reason of the fact that the collective bargaining agreements were subject to the Railway Labor Act. Since that time the Court has made it clear that substantive federal law applies to suits on collective bargaining agreements covered by § 204 of the Railway Labor Act, *International Assn. of Machinists* v. *Central Airlines, Inc.,* 372 U. S. 682, and by § 301 (a) of the LMRA, *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448. Thus a major underpinning for the continued validity of the *Moore* case in the field of the Railway Labor Act, and more importantly in the present context, for the extension of its rationale to suits under § 301 (a) of the LMRA, has been removed.

---

[11] Mississippi law, which controlled in *Moore* v. *Illinois Central R. Co.,* did not require exhaustion (but see *Illinois Central R. Co.* v. *Bolton,* 240 Miss. 195, 126 So. 2d 524 (1961)). Missouri law controlled in *Koppal* and did require exhaustion. The suing employee therefore lost.

We hold that any such extension is incompatible with the precepts of *Lincoln Mills* and cannot be accepted. Grievances depending on severance claims are not critically unlike other types of grievances. Although it is true that the employee asserting the claim will necessarily have accepted his discharge as final, it does not follow that the resolution of his claim can have no effect on future relations between the employer and other employees. Severance pay and other contract terms governing discharge are of obvious concern to all employees, and a potential cause of dispute so long as any employee maintains a continuing employment relationship. Only in the situation in which no employees represented by the union remain employed, as would be the case with a final and permanent plant shutdown, is there no possibility of a work stoppage resulting from a severance-pay claim. But even in that narrow situation, if applicable law did not require resort to contract procedures, the inability of the union and employer at the contract negotiation stage to agree upon arbitration as the exclusive method of handling permanent shutdown severance claims in all situations could have an inhibiting effect on reaching an agreement. If applicable law permitted a court suit for severance pay in any circumstances without prior recourse to available contract remedies, an employer seeking to limit the modes of redress that could be used against him could do so only by eliminating contract grievance procedures for severance-pay claims. The union would hardly favor the elimination, for it is in the union's interest to afford comprehensive protection to those it represents, to participate in interpretations of the contract, and to have an arbitrator rather than a court decide such questions as whether the company has determined to "close permanently." [12]

---

[12] See n. 1, *supra*.

There are, then, positive reasons why the general federal rule should govern grievances based on severance claims as it does others. Furthermore, no positive reasons appear why the general federal rule should not apply. "Comprehensiveness is inherent in the process by which the law is to be formulated under the mandate of *Lincoln Mills*," and "the subject matter of § 301 (a) 'is peculiarly one that calls for uniform law.' " *Teamsters Local* v. *Lucas Flour Co.*, 369 U. S., at 103. Maddox' suit in the present case is simply on the contract, and the remedy sought, award of $694.08, did not differ from any that the grievance procedure had power to provide. Federal law governs "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter . . . ." [13] Section 301 (a) of the LMRA, 29 U. S. C. § 185 (a) (1958 ed.), *Textile Workers* v. *Lincoln Mills*, *supra*. The suit by Maddox clearly falls within the terms of the statute and within the principles of *Lincoln Mills*, and because we see no reason for creating an exception, we conclude that the general federal rule applies.[14]

## III.

The federal rule would not of course preclude Maddox' court suit if the parties to the collective bargaining agreement expressly agreed that arbitration was not the exclu-

---

[13] "Between" in the statute refers to "contracts," not "suits." *Smith* v. *Evening News Assn.*, 371 U. S. 195, 200.

[14] By refusing to extend *Moore* v. *Illinois Central R. Co.* to § 301 suits, we do not mean to overrule it within the field of the Railway Labor Act. Consideration of such action should properly await a case presented under the Railway Labor Act in which the various distinctive features of the administrative remedies provided by that Act can be appraised in context, *e. g.*, the make-up of the Adjustment Board, the scope of review from monetary awards, and the ability of the Board to give the same remedies as could be obtained by court suit.

sive remedy.[15]   The section of this contract governing grievances provides, *inter alia:*

> "It is the purpose of this Section to provide procedure for prompt, equitable adjustment of claimed grievances.   It is understood and agreed that unless otherwise specifically specified elsewhere in this Agreement grievances to be considered hereunder must be filed within thirty days after the date on which the fact or events upon which such alleged grievance is based shall have existed or occurred.
>
> .        .        :        .        .
>
> "Any Employee who has a complaint may discuss the alleged complaint with his Foreman in an attempt to settle it.   Any complaint not so settled shall constitute a grievance within the meaning of this Section, 'Adjustment of Grievances'.
> "Grievances shall be handled in the following manner:
> "STEP 1. Between the aggrieved Employee, his Grievance Committeeman or Assistant Grievance Committeeman and the Foreman."

The procedure calls for two more grievance-committee steps capped with binding arbitration of matters not satisfactorily settled by the initial steps.

The language stating that an employee "may discuss" a complaint with his foreman is susceptible to various interpretations; the most likely is that an employee may, if he chooses, speak to his foreman himself without bringing in his grievance committeeman and formally embarking on Step 1.   Use of the permissive "may" does not of itself reveal a clear understanding between the contract-

---

[15] Of course a court suit on the collective bargaining agreement would still be governed by federal law.   *Textile Workers* v. *Lincoln Mills*, 353. U. S. 448.

ing parties that individual employees, unlike either the union or the employer, are free to avoid the contract procedure and its time limitations in favor of a judicial suit. Any doubts must be resolved against such an interpretation. See *United Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574; *Belk* v. *Allied Aviation Service Co.*, 315 F. 2d 513, cert. denied, 375 U. S. 847.

Finally, Maddox suggests that it was not possible for him to make use of the grievance procedure, the first step of which called for a discussion within 30 days of his discharge with his foreman, because a mine that has permanently closed has no foreman—indeed, no employees of any kind. This casuistic reading of the contract cannot be accepted. The foreman did not vanish; and it is unlikely that the union grievance procedure broke down within 30 days of Maddox' discharge. In any event, the case is before us on stipulated facts; in neither the facts nor the pleadings is there any suggestion that Maddox could not have availed himself of the grievance procedure instead of waiting nearly three years and bringing a court suit.

*Reversed.*

MR. JUSTICE BLACK, dissenting.

This is an ordinary, common, run-of-the-mill lawsuit for breach of contract brought by respondent Charlie Maddox, an iron miner employed by petitioner Republic Steel, to recover $694.08 of wages which he said the company owed him. This amount he said was due by the terms of a contract made between the company and the union representing workers at the mine at which Maddox worked, a contract which provided that if any employee should be discharged because the company "permanently" closed the mine, he should continue to be paid the amount of his regular wages for a number of weeks after the discharge. The mine closed down, Maddox lost his job, but

the company nevertheless refused to continue to pay him the wages he said it had obligated itself to pay under the contract. To collect the money he hired a lawyer and went to court. The trial court in Alabama awarded him the $694.08 (the stipulated amount due, if any) and the Supreme Court of the State affirmed. This Court now reverses. It holds that because the contract, agreed to by the union, provided for binding arbitration of all "grievances," federal law has deprived Maddox of his right to hire his own lawyer and to sue in a court of law for the balance of wages due,[1] and has instead left him with only the remedies set out in the contract: a long, involved grievance procedure, controlled by the company and the union, followed by compulsory arbitration, with his claim put in the hands of union officials and union lawyers whether he wants them to handle it or not.

In thus deciding on its own, or deciding that Congress somehow has decided, to expand apparently without limit the kinds of claims subject to compulsory arbitration, to include even wage claims, and in thus depriving individual laborers of the right to handle their wage claims for themselves, today's decision of the Court interprets federal law in a way that is revolutionary. Yet the Court disposes of this case as easily as it would reach the conclusion that 2 plus 2 equal 4. First the Court says that the contract between the union and the company provides that a laborer who wants to assert a "contract grievance" is bound to attempt to use the contract grievance procedure, which requires several stages of company-union meetings, negotiations, etc.,[2] to be followed

---

[1] Although the Court calls this "severance pay," it can be seen that the claim was simply one for wages which were to continue for a stated period after discharge.

[2] The grievance procedure set out in the contract was as follows:

"Any Employee who has a complaint may discuss the alleged complaint with his Foreman in an attempt to settle it. Any complaint

by submitting the dispute for final decision to an arbitrator "appointed by mutual agreement" of the union and the company. Next the Court labels Maddox' claim

---

not so settled shall constitute a grievance within the meaning of this Section, 'Adjustment of Grievances.'

"Grievances shall be handled in the following manner:

"STEP 1. Between the aggrieved Employee, his Grievance Committeeman or Assistant Grievance Committeeman and the Foreman.

"STEP 2. Between the Employee, his Grievance Committeeman or Assistant Grievance Committeeman and the Superintendent or his representative.

"STEP 3. Between the Grievance Committee, a representative of the International Union, the Superintendent of Industrial Relations, the Superintendent, and such Company representatives as he may select. Accurate minutes of this meeting shall be prepared by the Company not later than five days after the date of the meeting and shall be signed by representatives of the Union and the Company.

"Grievances not appealed from the decision rendered in writing in any of the three steps specified herein, within ten days from the date of such decision, shall be considered settled on the basis of the decision last made and shall not be eligible for further appeal.

"If any grievance is not answered within the time limits hereinafter specified in this Section, unless an extension of time has been mutually agreed upon, either party after notifying the other party by notation on the grievance papers of such intent may appeal to the next step.

"Grievances presented in the first step hereof shall be reduced to writing on forms provided by the Company, dated and signed by the Employee involved and two copies given to the Foreman, the Foreman will have inserted in the appropriate place on the form his disposition of the matter and will sign and date same, returning one copy to the Assistant Grievance Committeeman or Grievance Committeeman.

"The following time shall be allowed the Company to give an answer in each of the respective steps before the grievance may be processed to the next step: Step 1, three days exclusive of Sundays and Holidays; Step 2, seven days; Step 3, fifteen days.

"STEP 4. Except as otherwise expressly provided in this Agreement grievances not satisfactorily settled in Step 3 may by written notice within ten days from the date of the written decision in Step 3, be appealed to an impartial Arbitrator to be appointed by mutual

for wages due him a "grievance"—and, indeed, no one would deny that Maddox was unhappy about the company's failure to pay him what it had promised. Finally the Court, citing as its authority § 301 (a) of the Labor Management Relations Act,[3] lays down for this and future cases the flat rule that no matter what his contractual claim—or "grievance," as the Court prefers to call it— an individual laborer, even though no longer an employee, has no choice but to follow the long, time-consuming, discouraging road to arbitration set out in the union-company contract, including having the union represent him whether he wants it to or not and whether or not he is still in its good graces. And of course the Court's logic leads irresistibly to the conclusion (although it has not yet had occasion to say so) that if instead of seeking wages due on discharge an employee wants to sue his employer for unpaid wages while he is still working, he cannot do that either, but must instead wait until the union processes his claim through the interminable stages of "grievance procedure" and then turns him over to the arbitrator, whom he does not want. Employees are thus denied a judicial hearing and state courts have their ancient power to try simple breach-of-contract cases taken away from them—taken away, not by Congress, I think, but by this Court. Today's holding is in my judgment completely unprecedented, and is the brain-

---

agreement of the parties hereto within fifteen days after either party has requested arbitration. The decision of the Arbitrator shall be final."

[3] 61 Stat. 156, 29 U. S. C. § 185 (a) (1958 ed.). Section 301 (a) in its entirety reads as follows:

"Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

child of this Court's recent consistently expressed preference for arbitration over litigation in all types of cases [4] and for accommodating the wishes of employers and unions in all things over the desires of individual workers. Since I do not believe that Congress has passed any law which justifies any inference at all that workers are barred from bringing and courts from deciding cases like this one, and since I am not sure that it constitutionally could, it is impossible for me to concur in this decision.

I think one crucial flaw in the Court's logical presentation is that it treats things as the same which are in fact different. "Grievance" is a word of many meanings in many contexts, and yet the Court uses it without any discrimination among them. As used in the industrial field "grievance" generally signifies something that has happened that is unsatisfactory to employers or employees in connection with their work. Failure to settle serious and widespread grievances has sometimes brought about industrial tensions, strikes and violence, often disrupting the peace and doing irreparable harm to the economy of the Nation. In order to try to prevent such widespread disastrous results to the public, arbitration has come to be accepted as a good way to settle such semi-public controversies, which are more in the nature of power struggles between giants than ordinary justiciable controversies involving individual laborers.[5] When a contract provided for arbitration to settle disputes which affected many workers and which could lead to strikes, this Court

---

[4] See, e. g., Teamsters Local v. Lucas Flour Co., 369 U. S. 95; United Steelworkers v. Enterprise Wheel & Car Corp., 363 U. S. 593; United Steelworkers v. Warrior & Gulf Navigation Co., 363 U. S. 574; United Steelworkers v. American Mfg. Co., 363 U. S. 564.

[5] Compare the distinction in cases under the Railway Labor Act, 44 Stat. 577, as amended, 45 U. S. C. § 151 et seq. (1958 ed.) between "major" and "minor" disputes. See, e. g., Brotherhood of R. Trainmen v. Chicago R. & I. R. Co., 353 U. S. 30.

approved it and held that since both sides—company and union—had agreed to this method of peaceful settlement, federal law would honor and enforce it. *Textile Workers Union* v. *Lincoln Mills*, 353 U. S. 448. But to hold that the union and company can bind themselves to arbitrate a dispute of general importance affecting all or many of the union's members and vitally threatening the public welfare is a far cry from saying, as the Court does today, that an ordinary laborer whose employer discharges him and then fails to pay his past-due wages or wage substitutes must, if the union's contract with the employer provides for arbitration of grievances, have the doors of the courts of his country shut in his face to prevent his suing the employer to get his own wages for breach of contract. *Lincoln Mills* was a case involving a real and active collective bargaining dispute between union and employer over general working conditions; but the present case is a controversy not about general working conditions but about whether the company will pay one individual his wages.

For the individual, whether his case is settled by a professional arbitrator or tried by a jury can make a crucial difference. Arbitration differs from judicial proceedings in many ways: arbitration carries no right to a jury trial as guaranteed by the Seventh Amendment; arbitrators need not be instructed in the law; they are not bound by rules of evidence; they need not give reasons for their awards; witnesses need not be sworn; the record of proceedings need not be complete; and judicial review, it has been held, is extremely limited.[6] To say that because the union chose a contract providing for grievance arbitration an individual employee freely and willingly chose this

---

[6] See *Bernhardt* v. *Polygraphic Co.*, 350 U. S. 198, 203; *Wilko* v. *Swan*, 346 U. S. 427, 436. But see *Independent Petroleum Workers* v. *American Oil Co.*, 324 F. 2d 903 (C. A. 7th Cir.), affirmed by an equally divided Court, 379 U. S. 130.

method of settling any contractual claims of his own which might later arise is surely a transparent and cruel fiction. And even if the employee could with any truth be regarded as having himself agreed to such a thing, until recently this Court refused to recognize and enforce contracts under which individuals were to be denied access to courts and instead left to the comparatively standard-less process of arbitration. An insurance company cannot enforce a contract made with its insured to arbitrate all disputes which might arise in the future, this Court said, since such an agreement would be "an attempt to oust the courts of jurisdiction by excluding the assured from all resort to them for his remedy." *Riddlesbarger* v. *Hartford Ins. Co.,* 7 Wall. 386, 391. Cf. *Insurance Co.* v. *Morse,* 20 Wall. 445. The Court holds today, however, that a union representing a worker in a mine or factory can by the union's contract take away from that worker his right to sue, which he would not be able to contract away himself unless the *Riddlesbarger* case is to be over-ruled. Compare *Moseley* v. *Electronic & Missile Facilities, Inc.,* 374 U. S. 167, 172–173 (concurring opinion). And there is nothing in the legislative history of § 301 which indicates any congressional purpose to overrule or avoid the *Riddlesbarger* rule. Moreover, there is not one word in § 301 about agreements to arbitrate. It is true that this Court said in *Lincoln Mills,* "Plainly the agreement to arbitrate grievance disputes is the *quid pro quo* for an agreement not to strike," and "the entire tenor of the history indicates that the agreement to arbitrate grievance disputes was considered as *quid pro quo* of a no-strike agreement." [7] In that case, however, the Court expressly recognized that its decision and reasoning did "not reach" the right of individual employees to bring suit in court on their individual claims.[8] Forcing Charlie

---

[7] 353 U. S., at 455.

[8] *Id.,* at 459, n. 9.

Maddox, who is out of a job, to submit his claim to arbitration is not going to promote industrial peace. Charlie Maddox is not threatening to go out in the street by himself and stage a strike against the Republic Steel Corporation to get his unpaid wages. Merely because this Court in *Lincoln Mills* has expressed its preference for arbitration when used to avoid industrial warfare by heading off violent clashes between powerful employers and powerful unions,[9] it does not follow that § 301 should be expanded to require a worker to arbitrate his wage claim or to surrender his right to bring his own suit to enforce that claim in court. Such an expansion would run counter to this Court's long-established policy of preserving the ancient, treasured right to judicial trials in independent courts according to due process of law.

The past decisions of this Court which are closest to the case before us are not *Lincoln Mills* and cases like it, which involved broad conflicts between unions and employers with reference to contractual terms vital to settlement of genuine employer-union disputes. The cases really in point are those which involved agreements governed by the Railway Labor Act[10] and which expressly refused to hold that a discharged worker must pursue collective bargaining grievance procedures before suing in a court for wrongful discharge. *Transcontinental & Western Air, Inc.* v. *Koppal,* 345 U. S. 653; *Moore* v. *Illinois Central R. Co.,* 312 U. S. 630. While those were wrongful-discharge cases and the suit here is for wages due on a contract after discharge, the principle of those cases is precisely applicable here, since as was pointed out

[9] See, *e. g., United Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593; *United Steelworkers* v. *Warrior & Gulf Navigation Co.,* 363 U. S. 574; *United Steelworkers* v. *American Mfg. Co.,* 363 U. S. 564.

[10] 44 Stat. 577, as amended, 45 U. S. C. § 151 *et seq.* (1958 ed.). The Act of April 10, 1936, c. 166, makes the Railway Labor Act applicable to aviation workers. 49 Stat. 1189, 45 U. S. C. § 181 (1958 ed.).

in *Slocum* v. *Delaware, L. & W. R. Co.*, 339 U. S. 239, 244, the claim of a person no longer employed will almost never involve questions substantially affecting future relations between an employer and the remaining employees. The Court recognizes the relevance of *Moore* and *Koppal* and, while declining expressly to overrule them in this case, has raised the 'overruling axe so high that its falling is just about as certain as the changing of the seasons. Yet although members of Congress and alert counsel for the national unions and employers are bound to have been familiar with *Moore* at the time the comprehensive labor statute of which § 301 is a part was enacted, Congress did not see fit to disown the *Moore* rule and did not express a preference for a different policy with reference to individual suits on collective bargaining agreements covered by the LMRA.

The Court's opinion manifests great concern for the interests of employers and unions, but not, I fear, enough understanding and appreciation for an individual worker caught in the plight Maddox is in. The Court refers with seeming approval to the " 'common law' of the plant," and directs attention to the clear interest that the union has in handling employees' grievances in order to "enhance the union's prestige with employees." It also refers to the great interest that an employer has (and I agree) in having a complicated procedural system which dissatisfied employees are here compelled to follow, which ends up in binding arbitration and which relieves the employer of a lawsuit. The Court then expresses its view that allowing this former employee to sue without going through the grievance procedure and arbitration, as he would be permitted to do in this case by the law of his State,[11] has

---

[11] Alabama law does not require exhaustion of grievance procedures and arbitration in a case like this one. *Republic Steel Corp.* v. *Maddox*, 275 Ala. 685, 158 So. 2d 492; *Woodward Iron Co.* v. *Stringfellow*, 271 Ala. 596, 126 So. 2d 96.

"little to commend it" and "would deprive *employer* and *union* of the ability to establish a uniform and exclusive method for orderly settlement of employee grievances." I emphasize the words "employer" and "union" to point out that here, as elsewhere in the opinion, theirs seem to be the chief interests on which the Court's attention is focused. The procedure *they* (employer and union) want must be "made exclusive," or else *they* might not like it.[12] Individual workers are to take some comfort, I suppose, in the Court's statement that "it cannot be said, in the normal situation, that contract grievance procedures are inadequate to protect the interests of an aggrieved employee until the employee has attempted to implement the procedures and found them so." I think it can be said, however, and I say it. I think an employee is just as capable of trying to enforce payment of his wages or wage substitutes under a collective bargaining agreement as his union, and he certainly is more interested in this effort than any union would likely be. This is particularly true where the employee has lost his job and is most likely outside the union door looking in instead of on hand to push for his claim. Examples certainly have not been wanting from which the Court might learn that often employees for one reason or another have felt themselves compelled to sue the union as a prerequisite to obtaining any help from the union at all. See, *e. g., Humphrey* v. *Moore,* 375 U. S. 335; *Syres* v. *Oil Workers Int'l Union,* 350 U. S. 892; *Brotherhood of R. Trainmen* v. *Howard,* 343 U. S. 768; *Tunstall* v. *Brotherhood of Locomotive Firemen & Enginemen,* 323 U. S. 210; *Steele* v. *Louisville & N. R. Co.,* 323 U. S. 192. But, says the Court, the employee attempting to recover wages owed him must, unless the collective bargaining

---

[12] The AFL–CIO has filed an *amicus* brief supporting the employer in this case.

contract of the company and the union provides otherwise, "afford the union the opportunity to act on his behalf." The Court then implies that if the union "refuses to press or only perfunctorily presses the individual's claim," there may be some form of redress available to the worker, but we are left in the dark as to what form that redress might take. It may be that the worker would be allowed to sue after he had presented his claim to the union and after he had suffered the inevitable discouragement and delay which necessarily accompanies the union's refusal to press his claim. But I cannot agree that this is the sort of remedy a worker should have to invoke to bring a simple lawsuit.

I am wholly unable to read § 301 as laying any such restrictive burdens on an employee. And I think the difference between my Brethren and me in this case is not simply one concerning this Court's function in interpreting or formulating laws. There is also apparently a vast difference between their philosophy and mine concerning litigation and the role of courts in our country. At least since Magna Carta people have desired to have a system of courts with set rules of procedure of their own and with certain institutional assurances of fair and unbiased resolution of controversies. It was in Magna Carta, the English Bill of Rights, and other such charters of liberty, that there originally was expressed in the English-speaking world a deep desire of people to be able to settle differences according to standard, well-known procedures in courts presided over by independent judges with jurors taken from the public. Because of these deep-seated desires, the right to sue and be sued in courts according to the "law of the land," known later as "due process of law," became recognized. That right was written into the Bill of Rights of our Constitution and in the constitutions of the States. See *Chambers* v. *Florida,* 309 U. S. 227, 235–238. Even if it be true, which I do not concede,

that Congress could force a man in this country to have his ordinary lawsuit adjudicated not under due process of law, *i. e.*, without the constitutional safeguards of a court trial, I do not think that this Court should ever feel free to infer or imply that Congress has taken such a step until the words of the statute are written so clearly that no one who reads them can doubt. Cf. *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11; *United States* v. *Lovett,* 328 U. S. 303; *Duncan* v. *Kahanamoku,* 327 U. S. 304; *Reid* v. *Covert,* 354 U. S. 1, 5–10 (opinion announcing judgment); *Barsky* v. *Board of Regents,* 347 U. S. 442, 456 (dissenting opinion); *Stein* v. *New York,* 346 U. S. 156, 197 (dissenting opinion); *Shaughnessy* v. *United States ex rel. Mezei,* 345 U. S. 206, 216 (dissenting opinion); *Galloway* v. *United States,* 319 U. S. 372, 396 (dissenting opinion). Maddox has a justiciable controversy. He has not agreed since the controversy arose, or even for that matter before it arose, to arbitrate it, and so he should not have the doors of the courts shut in his face. Nor do I believe that he or any other member of the union should be treated as an incompetent unable to pursue his own simple breach-of-contract losses. I cannot and do not believe any law Congress has passed provides that when a man becomes a member of a labor union in this country he thereby has somehow surrendered his own freedom and liberty to conduct his own lawsuit for wages. Of course this is not the worst kind of servitude to which a man could be subjected, but it is certainly contrary to the spirit of freedom in this country to infer from the blue that workers lose their rights to appeal to the courts for redress when they believe they are mistreated. Compare *Smith* v. *Evening News Assn.,* 371 U. S. 195, 204–205 (dissenting opinion).

I would affirm.