**Wyman B. MITCHELL, Plaintiff,**

v.

**HERCULES INCORPORATED, Defendant.**

No. CV275–20.

United States District Court, S. D. Georgia, Brunswick Division.

March 20, 1976.

562

Robert Lee O'Brien, Jr., John D. Mattox, Jesup, Ga., for plaintiff.

Richard M. Scarlett, Brunswick, Ga. (Bennet, Gilbert, Gilbert, Whittle, Harrell & Gayner), Brunswick, Ga., H. Lane Dennard, Jr. (Thompson, Ogletree & Deakins), Greenville, S.C., for defendant.

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

LAWRENCE, Chief Judge.

### I

Plaintiff complains that Hercules Incorporated, the defendant, discharged him without cause while employed at its Brunswick, Georgia plant in violation of the Collective Bargaining Agreement between the Company and Union. The suit was initially brought in the Superior Court of Glynn County on December 20, 1974, and was removed to this Court pursuant to 28 U.S.C. § 1441 and 29 U.S.C. § 185. The Union is International Association of Machinists and Aerospace Workers, Lodge Number 839. It is not a party to this action.

The complaint alleges that plaintiff was wrongfully discharged on the ground that he was no longer physically able to perform his work as a Machinist

First Class.[1] In the alternative, Mitchell seeks recovery of medical expenses, loss of wages and general damages from Hercules for injuries "received while on his job and in the performance of his work".

█ Judge Alaimo who was originally assigned to the case recused himself after learning that he was disqualified. At that time a motion was pending for reconsideration of his Order overruling the defendant's motion for summary judgment based on failure of the Union to exhaust the grievance remedies in the Collective Bargaining Agreement. The Order denying the motion of Hercules was vacated by Judge Alaimo. The matter is now before me *de novo* on the record as it presently stands.

## II

Plaintiff contends that the failure by his Union to request arbitration of his unlawful discharge was a breach of its statutory duty of fair representation of employees and that he is thereby relieved of the necessity of resorting to the arbitration procedure.

"The only claim that I have," Mitchell testified, is that "the Union did not take a thorough investigation of the over-all situation and that upon asking for advice on what I should do, I was told to get myself a personal attorney." Deposition, p. 7. The Union had declined to carry the claim to arbitration after it had come before the Grievance Committee. "The Union representative told me that this was as far as the Union could take this procedure, and it was his advice to me to get me a personal attorney." Mitchell deposition, pp. 12, 7–8.

Article IX, Section 2, A of the Bargaining Agreement provides that in the case of a grievance the employee shall first discuss the matter with his immediate superior. If the employee wishes to carry the grievance further, it must be placed in writing and submitted to the immediate superior. Within three days thereafter the latter, the employee and his steward shall meet with the maintenance supervisor and plant engineer in an attempt to settle the matter. If unsuccessful, the complaint is referred to the Grievance Committee and the plant manager or his representative.

Grievances involving the discharge of any employee shall be referred directly to the Grievance Committee and thereafter be subject to the grievance procedure provided in the Agreement. If no agreeable solution is reached, either party may submit the matter to a Board of Arbitration composed of three arbitrators selected.[2] The Union agrees that "any employee shall have the right to present grievances . . . to the Management and to have such grievances adjusted without the intervention of the Union. . . . " Article IX, Section 2, H.

## III

█ Federal labor policy favors the use of arbitration of grievances under collective bargaining contracts. "Final adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." 29 U.S.C. § 173(d). "[T]he arbitrators under these collective agreements are indispensable agencies in a continuous collective bargaining process." *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424, 1427.

█ Jurisdiction under § 301 of the Labor-Management Act extends to suits to vindicate individual employee rights

1. Employment was terminated on February 12, 1974. The last day Mitchell worked was November 9, 1973.

2. The Board is composed of one arbitrator selected by the Company; one by the Union, and the other by the two arbitrators so selected. If the third arbitrator cannot be agreed upon, the Federal Mediation and Conciliation Service shall be requested to submit a list of seven persons with the right of each arbitrator to strike three names from the list.

arising from a collective bargaining contract. *Smith v. Evening News Association,* 371 U.S. 195, 200, 83 S.Ct. 267, 270, 9 L.Ed.2d 246, 251; *Hines et al. v. Anchor Motor Freight, Inc., et al.,* —— U.S. ——, 96 S.Ct. 1048, 47 L.Ed.2d 231 (44 LW 4299, 4301). However, "employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress. . . A contrary rule which would permit an individual employee to completely sidestep available grievance procedures in favor of a lawsuit has little to commend it." *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652–53, 85 S.Ct. 614, 616, 13 L.Ed.2d 580, 583. The requirement of exhaustion of grievance procedures before bringing an action under 29 U.S.C. § 185(a) is firmly settled. "If the collective bargaining agreement contemplates the use of a grievance procedure to protest a specific employer action, an employee may not sue for breach of contract on the basis of that action without first resorting to the procedure." *Boone v. Armstrong Cork Company,* 384 F.2d 285, 288 (5th Cir.); *Harris v. Chemical Leaman Tank Lines, Inc.,* 437 F.2d 167 (5th Cir.).

An exception to the exhaustion requirement exists where the union as bargaining agent has failed to fairly represent the employee in the handling of his grievances. " . . . [T]he wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance." *Vaca v. Sipes,* 386 U.S. 171, 186, 87 S.Ct. 903, 914, 17 L.Ed.2d 842, 855.[3] "The lesson taught by *Vaca v. Sipes,* 386 U.S. 171 [87 S.Ct. 903, 17 L.Ed.2d 842] 64 LRRM 2369 (1967), is that it is not generally the role of the courts to review whether employees should have been discharged under the collective bargaining agreement. The courts limit their involvement to those cases wherein the Union has acted in bad faith so as to have nullified the very intention of the parties that the grievance procedure determine the claim." *McFadden v. Ford Motor Co.,* 89 LRRM 2398 (E.D., Mich.).[4]

## IV

On February 12, 1974, plaintiff's employment was terminated by Hercules. The last time Mitchell had worked was on November 9, 1973. The discharge was apparently precipitated by a letter to the defendant-employer dated January 17, 1974, from a neurosurgeon of the employee's own selection. He was examined on January 11th. During a two-day period of hospitalization at Jacksonville, Dr. Thomas R. Boulter

**3.** The background of the discharge in *Vaca* bears similarity to the facts in the present case. An employee discharged for physical disability obtained a certificate from his physician attesting that he was able to return to work. The employer's doctor did not agree. The union carried the grievance through the initial steps but declined to arbitrate. In the resulting suit against the employer the plaintiff won a jury verdict on the basis of proof showing that he had been medically fit for heavy work at the time of the discharge. On certiorari the Supreme Court reversed. The question was not what the jury thought of the merits of the grievance. The issue was the union's arbitrary or bad-faith conduct in processing it.

**4.** There is a considerable body of law review articles dealing with the *Maddox* exhaustion requirement and the *Vaca* exception. See Simpson and Berwick, "Exhaustion of Grievance Procedures and the Individual Employee", 51 *Texas Law Review* (1973), 1201–1232; Andrew H. Levy, "The Collective Bargaining Agreement as a Limitation on Union Control of Employee Grievances", 118 *Pennsylvania L.Rev.* (1970), 1036; Paul H. Tobias, "A Plea for the Wrongfully Discharged Employee Abandoned by His Union", *Uni. Cincinnati L.Rev.* (1972), 55, 65–77; Julia Penny Clark, "The Duty of Fair Representation: A Theoretical Structure", 51 *Texas Law Review* (1973), 1119, 1122ff; Charles O. Gregory, *Georgia Law Review* (1966), 20, 30; Summers, "Individual Rights in Collective Agreements and Arbitration", 37 *N.Y.U.L.Rev.* (1962), 362. Benjamin Aaron, "The Union's Duty of Fair Representation Under the Railway Labor and National Labor Relations Acts", 34 *Journal of Air Law and Commerce* (1968), 167–171.

whose diagnosis was "degenerative lumbosacral spine, L5–S1" concluded that there was "probably a chronic low back sprain problem" but without evidence of disc disease. He advised the patient to avoid heavy lifting and twisting movements. "Undoubtedly, at this relatively young age if he persists in a stressful back activities he will only continue to plague us with a chronic back syndrome." [5]

Upon his discharge, Mr. Mitchell initiated through his Union a grievance proceeding against Hercules. It was processed through the third step, that is to say, through the grievance committee/plant manager meeting which was attended by the employee. Apparently the first three stages of the grievance process took place in February, 1974. Mitchell obtained no relief. For reasons not appearing, the Union declined to take the grievance to arbitration. Plaintiff did not individually pursue the right to arbitrate his grievance.

■ I am of the view that the Collective Bargaining Agreement confers upon an employee the individual right to request arbitration of his grievance. Article IX, Section 2, H, provides, as noted, that the Union agrees that "any employee shall have the right to present grievances . . . to the Management and to have such grievances adjusted without the intervention of the Union. . . ." [6] Under A of that Article "either the procedure set forth below in Paragraphs B–G, or the procedure set forth in Paragraph H, shall be followed in the handling of all grievances". I do not read this as meaning that "A" and "H" of Section 2 are mutually exclusive; that is to say, that an employee can avail himself of only one remedy and that the grievance once having been placed in the Union's hands and initiated cannot become individual prosecution by the employee himself at the arbitration stage of the controversy.

■ Nor does Hercules so construe the contract. Arbitration clauses in collective bargaining contracts are highly favored and are to be broadly and liberally construed. It has been said that they should be given the most liberal construction compatible with the intent of the parties as expressed therein. 51A C.J.S. Labor Relations § 426.

In *Vaca v. Sipes,* apparent significance was attached to the fact that the union had "*sole* power under the contract to invoke the higher stages of the grievance procedure". 379 U.S. at 185, 87 S.Ct. at 914, 17 L.Ed.2d at 855 (italic supplied). The bargaining agreement in *Mikelson v. Wisconsin Bridge and Iron Company,* 359 F.Supp. 444 (W.D., Wis.) provided that after the three initial steps of the grievance procedure either of the "parties" may request arbitration. The District Court stated that "since only the union and the company are parties to the agreement, the plaintiff had no power to commence arbitration". In the Fifth Circuit it has been said that an employer's defense based on an employee's failure to exhaust grievance remedies is available if "only the union has power to press the grievance beyond the initial stages of the contractual grievance procedure . . . ." *Sanderson v. Ford Motor Company,* 483 F.2d 102, 110. "On its face *Vaca's* duty of fair representation exception seems to apply only if the union has sole power under the contract to activate the higher stages of the grievance machinery." Simpson and Berwick, "Exhaustion of Grievance Procedures and the Individual Employee", 51 *Texas Law Review* (1973), 1206.

■ By virtue of Article IX, Section 2, H of the Bargaining Agreement and 29

---

5. Plaintiff's brief states that "No real attempt was ever made, on the part of either Hercules, Inc. or the Union, to determine the import of Dr. Boulter's letter upon which the wrongful discharge of Plaintiff was made. The meaning of that letter presents a question of fact to be decided in court."

6. This provision of the Labor Agreement between Hercules and the Union is no more than a contractual reiteration of the identical statutory right granted to an individual employee under the Labor-Management Relations Act, 29 U.S.C. § 159(a).

U.S.C. § 159(a), I think Mitchell was personally authorized to initiate the arbitration procedure without the intervention of the Union and that an election by him to proceed on his own behalf in arbitrating his grievance after availing himself of Union cooperation in the first stages of the grievance would not estop him from individual prosecution.[7]

I will return later to the subject of grievance remedies by employees individually and discuss it at greater length.

V

As suggested by the Union representative, Mr. Mitchell hired an attorney. His counsel transferred the theatre of war from the theory of a wrongful discharge grievance to obtaining redress under the Workmen's Compensation Act for a back injury received in the course of employment. On March 13, 1974, he filed a claim with the State Board claiming injuries from an accident occurring at Brunswick on June 12, 1973, while he was in the employment of Hercules. The nature of the alleged disability was "Chronic Back Injury". A hearing was requested because claimant had been separated from his employment due to "total physical disability" and his inability to perform his duties as a result of "very chronic back injury".

On June 25, 1974, Mitchell's attorney requested dismissal "in the light of the medical evidence in our file". The voluntary dismissal precluded further claim for compensation under the Act.

While Mitchell's Workmen's Compensation Claim was pending, Hercules deposed Dr. Boulter who had examined him at Jacksonville in January, 1974. The cross-examination of this neurosurgeon by his counsel focused primarily on the theory that claimant's lower back trouble could be the result of lifting heavy objects on June 12, 1973, and whether his findings ruled out the possibility of a herniated disc as the cause of the pain and disability.

Dr. Boulter testified that he did not think Mitchell "was in very bad shape". "He said he does very strenuous machine repair work and it seems from what he told me that this seems to aggravate his symptoms." The physician told him that "he could certainly work but . . . that he would probably be better off avoiding that kind of work responsibility in the interest of his future." Dr. Boulter did not intend to convey to Hercules through his report of January 17, 1974, any impression that Mitchell should be discharged because of his inability to perform the work of a machinist. He thought he could perform the job but "I think it would be prudent if he did not lift repetitive weights of not more than twenty-five pounds". Boulter deposition, pp. 30–32, 35–36, 40.

As matters turned out, the weakness of the medical evidence in support of his claim for workmen's compensation became the foundation and strength of his claim that the Union unfairly represented him in making an inadequate investigation and in not ascertaining the non-

---

7. The policy guidelines of the National Labor Relations Board issued by its General Counsel in respect to contract violation cases before the Board throw analogous light on exhaustion and deferral of decision pending resort by the charging party to alternative methods of settling the dispute. "Arbitration is to be considered available to the charging party where, upon exhaustion of the grievance procedure, arbitration procedures may be invoked by the charging party alone or by management and union representatives other than the immediate disputants. . . ." See Levin and Aksen, *Arbitrating Labor Cases* 413 (1974). In *Seng Co.*, 205 NLRB 200 (1973) deferral was refused where the union had been decertified. The Board stated that since "the contract grievance and arbitration procedure after the first step speaks only of the Union and the Company, we find that . . . it is extremely doubtful that these employees have independent status to pursue their rights under the arbitral process if the Union declines to represent them." See also *Hughes Tool Co.*, 56 NLRB 981 (1944). As to the right of individual employees to demand arbitration under the NLRA when the union refuses to do so, compare *Textron Puerto Rico (Tricot Div.)*, 107 NLRB 583 (1953).

disabling nature of his lower back condition. For an employee to say in one breath that he is significantly disabled by a back injury and in the next that he isn't really under any disability and his employer (and his Union) could have known as much had they taken the pains to look into the matter—such reads like a page out of Lewis Carroll. Yet that is about what we have here.

## VI

Did the Union breach its statutory duty under 29 U.S.C. § 159(a) of fair representation by failing to request arbitration and, as is alleged, by only perfunctorily pressing the individual's claim?

No collusion is charged as between the Union and Hercules. When Mitchell was deposed by the Company in the present action, he was asked whether the Grievance Committee had any hostility toward him, his reply was, "Not to my knowledge." He admitted that they were not hostile toward him or deceitful and did not treat him any "differently than they would treat other members of the Union". The only complaint he had with the Union "is that I didn't feel like that the procedure was taken care of in the way it should've been taken care of, that it was dropped premature before the complete action of the whole case was brought out." Mitchell had read the grievance-arbitration procedures of the bargaining contract. Deposition, pp. 6, 7, 10. In his own right (as granted in Article IX, Section 2, H) he did not request arbitration. He took the advice of the "local representative" and hired himself a personal attorney. The grievance proceedings came to a halt.

As the statutory representative of the employee, the union is "subject always to complete good faith and honesty of purpose in the exercise of its discretion". *Ford Motor Co. v. Huffman*, 345 U.S. 330, at 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048, 1058. While the employee cannot sidestep the grievance machinery provided in the contract, a different situation exists where "the union refuses to press or only perfunctorily presses the individual's claim . . . ." *Republic Steel Corp. v. Maddox, supra*, 379 U.S. at 652, 85 S.Ct. at 616, 13 L.Ed.2d at 583; *Hines et al. v. Anchor Motor Freight, Inc., et al., supra*, —— U.S. ——, 96 S.Ct. 1048, 47 L.Ed.2d 231 (44 LW 4301). A union does not breach its duty of fair representation "merely because it settled the grievance short of arbitration". *Vaca v. Sipes, supra*, 386 U.S. at 192, 87 S.Ct. at 918, 17 L.Ed.2d at 859. Unfair representation exists "only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith". *Vaca*, 190, 87 S.Ct. 916, 17 L.Ed.2d 857. Other nebulae in the "semantic universe" of the unfair-representation exception are fraud, discrimination, dishonesty, gross mistake, futility, and collusion.

"Although a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory manner, an employee does not have an absolute right to have any grievance taken to arbitration . . . ." *Lomax v. Armstrong Cork Company*, 433 F.2d 1277, 1281 (5th Cir.). In its role as the exclusive agent for all employees in the bargaining unit, the union has "the power to sift out frivolous grievances, to abandon processing of a grievance which it determines in good faith to be meritless, and to settle disputes with the employer short of arbitration". See opinion of District Judge Leo Brewster, which was adopted by the Fifth Circuit, in *Harris v. Chemical Leaman Tank Lines, Inc., supra*, 437 F.2d 171. For other Fifth Circuit cases dealing with fair-representation standards, see *Encina v. Tony Lama Boot Co., Inc.*, 448 F.2d 1264; *Turner v. Air Transport Dispatchers' Association*, 468 F.2d 297; *Sanderson v. Ford Motor Company, supra*, 483 F.2d at 110.

## VII

In applying these standards, courts have frequently granted summary judgment where the union is charged with bad faith or arbitrariness in failing to

process or perfunctorily pressing the employee's grievance. *Encina v. Tony Lama Boot Company, supra,* 448 F.2d 1264 (5th Cir.); *Harris v. Chemical Leaman Tank Line, Inc., supra,* 437 F.2d 167 (5th Cir.); *Turner v. Air Transport Dispatchers' Association, supra,* 468 F.2d 297 (5th Cir.); *Williams v. Kroger Co.,* 369 F.2d 85 (6th Cir.); *Balowski v. International Union, United Automobile Workers,* 372 F.2d 829 (6th Cir.).

Is this an appropriate case for summary disposition? The parties have zeroed on the letter-report of Dr. Boulter dated January 17, 1974. They draw different conclusions as to what he meant to convey as to the employee's ability to perform his work as a machinist. Plaintiff contends that Hercules and the Union "grossly misinterpreted" his report and relied on it principally, if not entirely, in his discharge by the employer, and by the Union in refusing to arbitrate. Mitchell claims that they construed the letter as meaning that he was disabled by chronic back trouble to such extent that he should not continue the work required of him as a machinist. Actually, Dr. Boulter's report says no more than that the employee probably has a chronic low back problem which aggravates a degenerative condition of the spine (L5–S1), causing recurrent pain, and that he informed Mr. Mitchell that "he has to make a decision to avoid heavy lifting and twisting movements in order not to aggravate his symptoms". Dr. Boulter testified on deposition that it was not his intention to say that Mitchell was unable to perform services as a machinist although lifting heavy loads would be "a chronic source of wear and tear on his low back". Deposition, pp. 35, 32.

It is too simplistic an approach to hinge fair representation on the report by itself. Whether the Union acted arbitrarily, perfunctorily or in bad faith in processing or not processing the grievance-arbitration procedures is more complicated. As far as Hercules was concerned, the report of the medical examination may have furnished proper basis for termination of employment. Mitchell had been away from his job for three months because of an ailing back. Subsequently, he contended in his Workmen's Compensation claim that the condition was the result of lifting heavy objects in the line of duty on June 12, 1973. Hercules was not aware of any such claim at the time of Mitchell's discharge. Industry is understandably reluctant to employ persons in heavy duty jobs who have back problems aggravatable by the nature of the work.

Of course, the right to terminate employment is not a unilateral decision for the employer but is subject to the grievance-arbitration procedures under which the discharged employee is entitled to process his grievance through his union. Mitchell contends that the Union was guilty of unfairly representing him when it failed or refused to take his grievance to arbitration and that such neglect by it excuses the failure to exhaust contract remedies prior to his suing Hercules under § 301.

To act "arbitrarily" means to act without "reason or judgment; depending on the will alone; absolutely in power; capriciously; tyrannical; despotic". *Central of Georgia Railway Company v. Mote,* 131 Ga. 166, 178, 62 S.E. 164, 170. To do something "perfunctorily" means, according to *The Oxford English Dictionary,* to do it merely to get through or rid of the matter; as a matter of routine and for form's sake only, without interest or zeal. For other definitions of the terms, see Tobias, *supra,* 41 *Uni. Cincinnati L.Rev.* at 73.

"Bad faith" cannot be defined with mathematical precision and ultimate definition depends upon the facts and circumstances of the particular case. 7 C.J.S. p. 1317. Usually bad faith involves "subjective mental processes or state of mind". *Encina v. Tony Lama Boot Company, supra,* 448 F.2d at 1265.

In *Hines et al. v. Anchor Motor Freight, Inc., et al., supra,* the Supreme Court nullified an arbitration award in favor of the employer where there was

evidence that the union had failed properly to investigate the basis of discharge. Despite the fact that it carried the dispute through arbitration, the claim of breach of duty could amount to arbitrary, perfunctory and bad faith conduct. Consequently, the result of the arbitral procedure was free of the bar of the finality provisions of the labor agreement for the purposes of the § 301 action against the union and employer brought by the terminated employees. The door to § 301 which was slightly ajar is opened wider by *Hines.*

██ Insofar as exhaustion relates to the Union in this case, I do not think summary disposition is in order, at least on the basis of the record now before the Court. "As a general proposition, summary judgment is likely to be inappropriate when issues of motive, intent and other subjective feelings and reactions are material." 6 *Moore's Federal Practice* § 56.17[41–1]; *Conrad v. Delta Air Lines, Inc.,* 494 F.2d 914, 918 (7th Cir.). In the Fifth Circuit it is "held that the issue of bad faith must be generally determined by plenary rather than summary procedures". *Encina v. Tony Lama Boot Company, Inc., supra,* 448 F.2d 1265.

Defendant's motion for summary judgment is therefore denied as to the defense of non-exhaustion of the arbitration procedure. But what of Mitchell's failure to pursue individually the right of arbitration of his grievance concerning his discharge?

### VIII

██ In Division IV I expressed the view that a discharged employee has the right on his own behalf under the Collective Bargaining Agreement to prove a grievance as to wrongful discharge and to have same adjusted without intervention by the Union, the latter reserving the right of being present at every step relative to adjustment of the dispute. The labor Agreement states that the individual "shall have the right" referred to; it does not say that exercise of it is mandatory. However, general federal policy which favors arbitration of labor disputes (29 U.S.C. § 173(d)) precludes court actions unless the parties to the collective bargaining agreement have expressly agreed that arbitration is *not* the exclusive remedy. *Republic Steel Corp. v. Maddox, supra,* 379 U.S. 657–658, 85 S.Ct. 618–619, 13 L.Ed.2d 585–586.

Exhaustion of grievance procedures under a collective bargaining agreement is a condition precedent to an action by an employee under § 301 for wrongful discharge. Of course, that requirement is subject to exception in the event of unfair union representation of the employee. I perceive no difference as to exhaustion as between the union's duty as exclusive bargaining agent of employees and the employee's individual duty where the contract confers the right to arbitrate the grievance independently of the union. The underlying federal policy favoring private resolution of labor disputes is as much subserved by requiring exhaustion of grievance procedures in the latter instance as in the first.

The requirement that an employee who in his own right resorts to arbitration before suing his employer for wrongful discharge finds support in *Donnelly v. United Fruit Company,* 40 N.J. 61, 190 A.2d 825. The Supreme Court of New Jersey concluded that "an individual employee has a statutorily-vested right to present his grievance to, and to have it determined by, his employer when the union declines to process it in his behalf". p. 839. The "statutorily-vested right" referred to is that of an employee to present grievances to the Management and to have same adjusted without the intervention of the union. 29 U.S.C. § 159(a). "[W]here the union declines to invoke the grievance procedure in an alleged improper discharge case, a damage suit does not lie against the employer until a request is made by the employee to process the grievance himself in accordance with the bargain-

ing contract, and the employer refuses to do so." *Donnelly*, 843.[7]

It is said that "the Courts have uniformly refused to find this right either within or without section 9(a), recognizing it only when the bargaining agreement specifically so provided". *Simpson* and *Berwick, supra*, 51 *Texas Law Review*, 1227. Actually there is a dearth of judicial authority on the subject of the individual right to process a grievance. One decision runs counter to the view I have expressed. The case involved a Spanish-speaking hotel maid who sued an employer for wrongful discharge and her union for unfair representation in refusing, over her objection, to process the grievance. The district court held that no action lay under § 301 since the labor contract gave plaintiff the right to initiate her own grievance. The Court of Appeals for the Ninth Circuit reversed. Avoiding the question of interpretation, it ruled that irrespective of any individual right the employee may have had to pursue the grievance individually, the conduct of the union, including failure to inform her of such rights, excused her failure to to do so.[8]

I content myself with the observation that in the present case the employee was authorized in his own right to require arbitration when the Union failed to do so; that Mr. Mitchell had read the contract, and that he was advised by the Union representative to get a lawyer which he did. Hercules says that it did not in any way repudiate the grievance procedures and that "management was available within the prescribed time periods for the processing of Mitchell's grievance under the arbitration procedure in the Contract". See Affidavit of Personnel Manager of Hercules, dated February 3, 1975. Mitchell states that he understood that he could not continue the grievance procedure individually with management once the union commenced same.

## IX

Having reached this point, where does the Court go from here? I have concluded that the appropriate route is retention of jurisdiction pending Mitchell's opportunity to avail himself of the arbitration rights conferred on him individually under the Bargaining Agreement. He complains that the Union acted in bad faith in declining to take that fourth step in the grievance process. He can do so now in his own right as an individual.[9] It is not too late.

There is nothing new or strange in giving such direction to a case like this. In *Boone v. Armstrong Cork Company*, 384 F.2d 285, 290 the Fifth Circuit said:

"Since the parties, under a common misconception of their contractual obligations, have abandoned the grievance procedure before any 'complaint' could exist, Boone is entitled even at this late date to resort to the grievance procedure. In view of the strong policy favoring resort to contract grievance procedures before the courts are presented with this type dispute, we feel that under the facts the company has not wrongfully refused to process

---

7. This accords with the view of Professor Summers who maintained that § 29 U.S.C. § 159(a) confers on an employee the absolute right to process substantive grievances and that pursuant to the national policy supporting arbitration the employee should be permitted to compel arbitration but not freely to go into court at that stage. See Summers, "Individual Rights in Collective Agreements and Arbitration", 37 *N.Y.U.L.Rev.* (1962), 362, 376–385.

8. *Retana v. Apartment, Motel, Hotel and Elevator Operators Union, Adlaw Investment Company, Ltd.*, 453 F.2d 1018 (9th Cir.); *Cf.*

*Brookins v. Chrysler Corporation*, 381 F.Supp. 563, 566 (E.D., Mich.).

9. I should point out that Judge Alaimo agreed with the construction of the bargaining agreement urged by plaintiff's counsel. In his Order of March 24, 1975, he sustained the contention that under Article IX the grievance could be pursued *either* with union assistance *or* without it but not both with and without same. The Order referred to was vacated by Judge Alaimo on September 2, 1975.

the grievance so as to eliminate the requirement that the process be used.

. . .

"The case must be remanded to the district court with directions to suspend further proceedings until the parties have had reasonable opportunity to exhaust the contractual grievance procedure."

See also *Lomax v. Armstrong Cork Company*, 433 F.2d 1277, 1281 (5th Cir.); *International Association of Heat and Frost Insulators v. Leona Lee Corp.*, 434 F.2d 192, 194 (5th Cir.); *Tobias, supra*, 41 *Uni. Cincinnati L.Rev.* 89.

Plaintiff's § 301 action against Hercules is stayed pending arbitration of the grievance. The procedure will be initiated by Mr. Mitchell with reasonable promptness. The governing procedures will be those prescribed in the Agreement. The central issue of the arbitration is, as I see it, whether or not the discharge was justified in the light of condition of employee's lower back as it existed at and around the time of termination.

### X

One phase of the motion for summary judgment remains for disposition. Mitchell sues Hercules in the alternative to recover damages for injury to to his back while in defendant's employ. Although the complaint does not make it entirely clear, the claim in question evidently constitutes a tort action under Georgia law.

Mitchell and Hercules are admittedly covered by the Georgia Workmen's Compensation Act. The law provided at the time the alleged injury occurred that "The rights and remedies herein granted to an employee where he and his employer have accepted the provisions of this Act respectively to pay and accept compensation on account of personal injury or death by accident shall exclude all other rights and remedies of such employee . . . ." Ga.Code Ann. § 114–103. The courts of this State have uniformly held that an employee cannot maintain a common law action for damages against his employer where both are subject to the Workmen's Compensation Act. *Blue Bell Globe Manufacturing Co. v. Baird*, 61 Ga.App. 298, 6 S.E.2d 83; *Wall v. J. W. Starr & Sons Lumber Co.*, 68 Ga.App. 552, 23 S.E.2d 452; *McLaughlin v. Thompson, Boland & Lee, Inc.*, 72 Ga.App. 564, 34 S.E.2d 562; *Southern Wire & Iron, Inc. v. Fowler*, 217 Ga. 727, 124 S.E.2d 738; *United States Fidelity & Guaranty Co. v. Forrester*, 230 Ga. 182, 196 S.E.2d 133; *Massey v. Thiokol Chemical Corporation*, 368 F.Supp. 668, 676 (S.D., Ga.).

Defendant's motion for summary judgment is granted in respect to that portion of the complaint alleging a claim for damages growing out of the back injury.