RACINE EDUCATION ASSOCIATION, a labor organization, Karen L. Vaughn, Mark M. Farris, Richard Dean Johnson, Norah Mc Cue, and Dennis Wiser, on behalf of themselves, and all others similarly situated, Plaintiffs-Respondents-Cross Appellants,

v.

RACINE UNIFIED SCHOOL DISTRICT and The Board of Education of the Racine Unified School District, Defendants-Appellants-Cross Respondents.†

Court of Appeals

*No. 92–1189. Submitted on briefs January 26, 1993.—Decided April 14, 1993.*

(Also reported in 500 N.W.2d 379.)

†Petition to review denied.

On behalf of the defendants-appellants-cross respondents, the cause was submitted on the briefs of *Stephen P. Juech* and *De Vonna Joy* of *Frisch Dudek, Ltd.* of Milwaukee.

On behalf of the plaintiffs-respondents-cross appellants, the cause was submitted on the briefs of *Carol L. Rubin* of *Kelly and Haus* of Madison.

Before Nettesheim, P.J., Anderson and Snyder, JJ.

NETTESHEIM, P.J. The Racine Unified School District and Board of Education (district) appeal from a judgment and an order premised upon the circuit court's determination that the district breached a fiduciary duty to the Racine Education Association (REA) in the administration of an employee tax sheltered annuity program. The REA cross-appeals the damage award.

The district raises a variety of appellate issues. However, we deem dispositive the circuit court's ruling rejecting the district's motion for summary judgment. The court held that the REA was not required to exhaust its contractual remedies under the arbitration provision of the parties' collective bargaining agreement. We conclude that the exclusive remedy available to the REA for the resolution of its dispute with the district lies pursuant to the arbitration provision in the parties' collective agreement. We therefore reverse the judgment and order. We remand with directions that the court enter judgment dismissing the REA's complaint.

## FACTS

### Background and Procedural History

The district began offering its teachers a voluntary tax sheltered annuity (TSA)[1] program in 1967. Under the program, the teachers authorize the district to

---

[1] A tax sheltered annuity is a tax avoidance device which allows governmental employees to reduce their tax liability by

withhold certain moneys from their bi-weekly paychecks and to remit the funds to designated TSA carriers. However, the district does not remit the withheld funds to the TSA carriers until the end of each month. Instead, the district deposits the funds into its "Tax-Sheltered Annuity Account." From this account, the funds are invested on a nightly basis, producing interest income to the district. The funds are returned to the district's TSA account the next business day. The interest earned on these nightly investments is deposited into the district's general fund. None of this interest is credited to the district's TSA account and it is not forwarded to the TSA carriers at the end of the month.

The TSA procedures adopted by the district in 1967 were not the subject of collective bargaining between the parties, but were instead suggested to the district by the REA "Insurance Committee." The committee represented the interests of all district employees, including supervisors and administrators. One of the committee's suggested procedures was that withheld contributions be remitted to TSA carriers on a monthly basis. Another suggested procedure reserved to the district the right to alter the procedures governing the TSA program as deemed necessary. Consistent with the committee's suggestion, the district's resolution formally authorizing the TSA program allowed the district to "formulate rules and procedures for the purchase and administration of annuity policies as shall from time to time be required." Since 1967, the district has unilaterally modified the majority of TSA practices adopted pursuant to the committee's suggestions, but has continued remitting

deferring income until a later date—usually after retirement—when the employee's tax liability is typically reduced.

employee withheld contributions to TSA carriers on a monthly basis. The parties' collective bargaining agreements have never incorporated the 1967 procedures adopted by the district.

On January 17, 1991, the REA, as the exclusive bargaining representative for teachers in the district, filed this action in circuit court challenging the district's monthly practice of transmitting the moneys withheld from the teachers' bi-weekly paychecks.[2] The REA alleged that the district was obligated by both written employee authorizations and the parties' collective bargaining agreement to transfer the deducted amounts in a timely manner.[3] Claiming that the district's procedures deprived the teachers of the interest on their contributions for the period between the first withholding and the monthly transmittal to TSA carriers, the REA sought to recover the past lost interest. The REA also sought an order requiring timely remittal of employee funds.

The parties agree that neither the REA nor any individual teacher grieved the district's TSA proce-

---

[2] When the action was filed on January 17, 1991, the REA and five individual teachers were named as plaintiffs. On October 17, 1991, the circuit court granted the plaintiffs' motion certifying the teachers of the district as a class. The class includes the approximately 843 past and present teachers who have participated in the district's tax sheltered annuity program.

[3] Specifically, the REA's complaint alleged in relevant part that:

> The District is obligated, pursuant to the written salary reduction authorization of the participating bargaining unit member and Sec. 19.6 of the Collective Bargaining Agreement, to transfer the above-described salary reductions in a timely manner to the provider of the tax sheltered annuity selected by such bargaining unit member.

dures or sought arbitration pursuant to the collective bargaining agreement.

### *The Collective Bargaining Agreement*

At all times material to this action, a collective bargaining agreement between the district and the REA governed disputes concerning the wages, hours, and other conditions of employment of employees represented by the REA. The relevant provisions of the 1988–90 agreement provide:

9.1 Grievance Claim

A grievance is a claim which alleges that one or more provisions of this Agreement or established District policy has been incorrectly interpreted and applied. Such claim must be based on an event or condition which affects wages, hours and/or conditions of employment of one or more teachers.

. . . .

9.7 Sole Remedy

The sole remedy available to any teacher for any alleged violation of this Agreement or his/her rights hereunder shall be pursuant to the grievance procedure.

. . . .

19.6 Tax Sheltered Annuities

The Board shall make available payroll deductions for tax sheltered annuities, if allowed by law. (In addition to the normal contribution to the Wisconsin Retirement System, a teacher may, in lieu of compensation, have a tax sheltered annuity purchased by the District with the provision that the amounts for this annuity be currently non-taxable,

the annuity itself being fully taxable upon receipt, if allowed by law.)

Though never effected, the REA proposed the following change to section 19.6 prior to the parties' adoption of the 1988–90 agreement:

5. The Board shall make available payroll deductions for tax sheltered annuities, if allowed by law. (In addition to the normal contribution to the State Teacher Retirement System, a teacher may, in lieu of compensation, have a tax sheltered annuity purchased by the District with the provision that the amounts for this annuity be currently non-taxable, the annuity itself being fully taxable upon receipt, if allowed by law.) *Deductions from employees salary for tax sheltered annuities shall be submitted to the carrier within five (5) working days.* [Emphasis added.]

### The Circuit Court's Ruling

The district moved for summary judgment, arguing that the circuit court lacked jurisdiction because the REA had failed to exhaust its contractual remedies under the arbitration provision of the parties' collective bargaining agreement. The REA responded that it was not seeking to enforce any rights or terms under the agreement. In support, the REA noted that the collective bargaining agreement did not specify how the TSA contributions were to be invested during the interim between collection and disbursement to the TSA carriers at the end of each month.

The circuit court agreed with this argument, noting that the "focus [of the REA's claim] is not on the existence of the TSA program, but is on the alleged delay and misuse of TSA funds." The court also held that if the district's investment policy was based on the

procedure adopted in 1967, such was not the product of the parties' collective bargaining. The court also observed that the district had previously asserted that timing of TSA disbursements was not a bargainable issue. Thus, the court concluded that the dispute could not be grieved and was not subject to arbitration.

The matter proceeded to trial. Most of the issues were tried to a jury. However, the fiduciary duty issue which produced the judgment in REA's favor was tried to the court. The circuit court ultimately determined that the district's investment policy breached the district's fiduciary duty owed to the REA.

## ANALYSIS

On appeal, the district raises a host of appellate issues.[4] The REA raises a single issue as to damages by cross-appeal. We conclude, however, that the circuit court's summary judgment determination is dispositive as to all issues on appeal.

Whether the REA's claim is a grievance subject to arbitration under the terms of the parties' collective bargaining agreement is a question of law which we

---

[4] The district contends the circuit court erred when it: (1) determined the REA was not required to exhaust its contractual remedies under the parties' collective bargaining agreement prior to bringing this action in circuit court; (2) determined the district was not immune from suit under sec. 893.80(4), Stats.; (3) took the plaintiffs' breach of fiduciary duty claim from the jury; (4) determined that the evidence was sufficient to establish the plaintiffs' breach of fiduciary duty claim; and (5) excluded evidence of the Wisconsin Retirement System's procedures regarding teachers' benefits and evidence of the district's administrative costs under the TSA program.

review *de novo. See Local 1226 v. City of Rhinelander,* 35 Wis. 2d 209, 219, 151 N.W.2d 30, 35 (1967).

The public and legislative policy of this state favors grievance and arbitration procedures over judicial resolution of labor management disputes. *See Joint School Dist. No. 10 v. Jefferson Educ. Ass'n,* 78 Wis. 2d 94, 112, 253 N.W.2d 536, 545 (1977). Grievance and arbitration procedures included in a collective bargaining agreement are presumed to be exclusive remedies unless the parties to the agreement expressly agree that they are not. *See Mahnke v. WERC,* 66 Wis. 2d 524, 529, 225 N.W.2d 617, 621 (1975) (citing *Vaca v. Sipes,* 386 U.S. 171, 184 n.9 (1967); *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 657-58 (1965)).

In keeping with these general principles, the law has fashioned a very limited and narrow test for deciding whether a particular controversy is subject to the grievance and arbitration provisions of a collective bargaining agreement:

> When the court determines arbitrability it must exercise great caution. The court has no business weighing the merits of the grievance. It is the arbitrator's decision for which the parties bargained. In *Dehnart v. Waukesha Brewing Co., Inc.,* 17 Wis. 2d 44, 115 N.W.2d 490 (1962), this court adopted the *Steelworkers Trilogy* teachings of the court's limited function. *The court's function is limited to a determination whether there is a construction of the arbitration clause that would cover the grievance on its face and whether any other provision of the contract specifically excludes it.*

*Joint School Dist. No. 10,* 78 Wis. 2d at 111, 253 N.W.2d at 545 (emphasis added). These principles

apply whether the arbitration clause is broad or narrow. *See id.* at 111–12, 253 N.W.2d at 545. In addition, "[a]n order to arbitrate the particular grievance should not be denied unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Id.* at 112, 253 N.W.2d at 545 (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)) (emphasis added).

With these principles in mind, we cannot say under the positive assurance" test of *Joint School District No. 10* that the dispute here is not subject to the grievance and arbitration procedure set out in the parties' collective bargaining agreement.

The parties' collective bargaining agreement in this case requires the district to provide a TSA program for its teachers. The agreement also provides that the exclusive procedure for resolving disputes about the interpretation and application of the agreement is the grievance/arbitration procedure. A claim under this procedure must be related to a teacher's wages, hours or conditions of employment.

The parties do not dispute that the REA's claim affects the teachers' wages or conditions of employment.

The closer question is whether the dispute involves a claim that an agreement provision has been incorrectly interpreted and applied. The REA argues that the controversy is not subject to the grievance/arbitration procedure because the agreement does not specifically regulate how the TSA funds are to be invested during the interim between withholding and the ultimate transfer to the TSA carriers at the end of the month. The REA also observes that the par-

ties are bound to arbitrate an issue under their collective bargaining agreement only if they agreed to submit the issue to arbitration. *See Milwaukee Teachers' Educ. Ass'n v. Milwaukee Bd. of School Directors,* 147 Wis. 2d 791, 795-96, 433 N.W.2d 669, 671 (Ct. App. 1988).

We do not disagree with these general statements and principles. However, an agreement to arbitrate an issue need not be express—it may be reasonably implied from the language of the agreement in the absence of a specific provision expressly excluding it. *See Milwaukee Police Ass'n v. City of Milwaukee,* 92 Wis. 2d 145, 152-53, 285 N.W.2d 119, 122 (1979); *Joint School Dist. No. 10,* 78 Wis. 2d at 111-13, 253 N.W.2d at 544-45.

Taken to its logical conclusion, the REA's argument would require a collective bargaining agreement to address all possible disputes which might arise under an obligation recited in the agreement before the grievance/arbitration procedures would apply. If not so delineated, the grievance/arbitration process would be limited to only whether the express obligation in the agreement had been performed. It could not inquire further as to any other implicit obligations which stem therefrom. This approach, we conclude, runs counter to the very spirit and purpose of the grievance/arbitration process. In *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574 (1960), the United States Supreme Court said:

> "There are too many people, too many problems, too many unforeseeable contingencies to make the words of the contract the exclusive source of rights and duties. One cannot reduce all the rules governing a community like an industrial plant to fifteen or even fifty pages. . . ."

. . . .

> [T]he product of negotiations . . . is . . . "a compila-
> tion of diverse provisions: some provide objective
> criteria almost automatically applicable; some pro-
> vide more or less specific standards which require
> reason and judgment in their application; and some
> do little more than leave problems to future consid-
> eration with an expression of hope and good faith."
> [Citations omitted.]

*Id.* at 579, 580.

Thus, we do not look for a clause in the agreement which expressly covers the dispute. Rather, we look to whether the agreement *could* cover the controversy. *See Joint School Dist. No. 10*, 78 Wis. 2d at 111, 253 N.W.2d at 545. In so doing, we must be positively assured that the agreement is not susceptible of an interpretation that covers the dispute. *Id.* at 112, 253 N.W.2d at 545.

Here, the collective bargaining agreement clearly and plainly sets out the district's obligation to provide its teachers with a TSA program. The dispute in this case grows directly out of this threshold obligation. The dispute concerns the mechanics by which the district must discharge this obligation. Under the *United Steel-workers* rationale, the failure of the collective bargaining agreement to expressly address this proce-dural matter does not take the controversy out from under the grievance and arbitration procedures in the agreement.

■

In summary, the collective bargaining agreement in this case could cover the dispute, and there is no other provision of the agreement that specifically excludes the dispute. *See Joint School Dist. No. 10*, 78 Wis. 2d at 111, 253 N.W.2d at 545. We are not posi-

tively assured that the agreement does not cover the dispute. We therefore conclude that the controversy is subject to the grievance and arbitration provisions of the parties' collective bargaining agreement.

We reverse the judgment and order and remand with directions to enter summary judgment in favor of the district.

*By the Court.*—Judgment and order reversed and cause remanded with directions.