73 F.3d 361
 151 L.R.R.M. (BNA) 2288
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
BUILDING MATERIAL, COAL AND EXCAVATING DRIVERS AND HELPERS,
LOCAL 247, Plaintiff-Appellant,
v.
EDWARD C. LEVY COMPANY, of Michigan, doing business as
Clawson Concrete, Incorporated, Defendant-Appellee.
 No. 94-1497.
 United States Court of Appeals, Sixth Circuit.
 Dec. 27, 1995.
 
 Before: CONTIE, NELSON, and RYAN, Circuit Judges.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant, Building Material, Coal and Excavating Drivers and Helpers Union, Local 247 [hereinafter, "Local 247" or "the Union"], appeals the district court's dismissal of its action against defendant-appellee, Edward C. Levy Co., d/b/a Clawson Concrete, Inc. [hereinafter "Clawson" or "the Company"], for failure to exhaust grievance remedies as provided in the parties' collective bargaining agreement [hereinafter, "CBA"].
 
 I.
 
 2
 In the present case, plaintiff Local 247 filed a grievance on behalf of Charles Long, an employee of defendant Clawson, who was discharged after testing positive for marijuana during a random drug test.
 
 
 3
 Pursuant to the collective bargaining agreement between plaintiff and defendant, the grievance had to go through a series of steps. Article X, Provision C, of the CBA sets forth a three-step process by which a party must initially attempt to resolve a grievance, dispute, or complaint between the Union and the Company. If the matter is not resolved pursuant to "Provision C," the matter is referred to a Joint Grievance Board [hereinafter, "the Board"], consisting of two industry representatives and two union representatives. Art. X, Sec. D. A majority decision of the Joint Grievance Board is "final and binding on all parties including the employees involved." Art. X, Sec. F. If the Board is deadlocked, either party may request that the matter be referred to arbitration. Should neither party request arbitration, "the grievance shall be considered acted upon and closed." Art. X, Sec. H.
 
 
 4
 In the present case, the grievance was not resolved through the three-step process of Provision C and was referred to the Joint Grievance Board. On May 19, 1992, the Joint Grievance Board considered Long's grievance. Grievant Long protested his discharge for testing positive for marijuana. He alleged that no split sample was taken at the time of the test.[1] The Union stated that the Company did not present proof about the chain of custody regarding the sample, although the Union had requested documentation at the local hearing level. The Union contended before the Board that the proper procedures were not followed and the chain of custody was not properly documented.
 
 
 5
 After hearing this testimony, the Board rendered the following decision on May 19, 1992.
 
 
 6
 May 19, 1992 DECISION: Within ten (10) days, the company shall provide the chain of custody form to the union business agent and to the grievant for their review. If there are any inconsistencies or errors in this chain of custody, grievant will be reinstated and made whole for time lost.
 
 
 7
 Within ten (10) days, grievant may, "at his or her own expense by an independent laboratory in the event questions are raised concerning the accuracy of the test," provide for testing of the split sample. If the split sample tested is negative, lost or contaminated, the test will be presumed negative and grievant will be reinstated and made whole for time lost.
 
 
 8
 In the event that grievant tests positive on the split sample and in the event that the chain of custody is appropriate, then, the termination shall stand and grievant shall be discharged.
 
 
 9
 By letter dated May 29, 1992, Clawson contacted the grievance panel and stated the following:
 
 
 10
 The Company finds that it is legally unable to comply with the decision put forth by the board relative to the chain of custody form. Specifically, after discussions with James Siskosky, D.O., the company's primary medical review officer; Lois Schnabel of Oakwood Downriver, the collection site for Mr. Long's specimen; and her subsequent conversation with Steve VanNus of Roche Lab, the laboratory processing entity, it has been determined that the above individuals all find the interpretation of DOT Regulation 40.33, Section H, Report and Review of Results, to require that only the medical review officer hold possession of the final chain of custody document, and that document should not be released to any person or entity without a subpoena.
 
 
 11
 During the grievance hearing the company did provide an edited copy of the chain of custody form, in which we are in possession of, and entitled to. We also provided a statement written by Dr. Melanie Hanna, the medical review officer in this case, indicating that the chain of custody and all proper DOT regulations were reviewed and determined properly "implemented and followed." Therefore, it is our contention that we have indeed complied with this part of the decision imposed on the company to the best of the company's ability.
 
 
 12
 Subsequently, the Union requested a clarification of the Board's decision about whether the Board's decision was "meant to cover the situation where the Company refused to provide the chain of custody form to the business agent and to the grievant for their review."
 
 
 13
 On July 16, 1992, the Board held another meeting. Defendant Clawson was not notified that the matter would be discussed at the meeting, and therefore was not present and presented no evidence. In a decision of July 16, 1992, the Board rendered a clarification of its earlier decision, stating:
 
 
 14
 While implicitly the grievance decision of May 19, 1992, did cover the situation, same can be clarified. At the end of the first paragraph of the DECISION [of May 19, 1992] the following sentence should be added:
 
 
 15
 If the company fails to provide chain of custody documentation, then the grievant shall be reinstated and made whole for time lost.
 
 
 16
 For reasons not apparent in the record, the Union once again requested that the matter be placed on the Board's docket for further clarification of its decision rendered on May 19, 1992 and clarified on July 16, 1992. At the same time, Clawson requested that it be allowed to present evidence as to why it failed to provide the chain of custody information within ten days. The Board held a meeting to consider these issues on February 18, 1993.
 
 
 17
 At the hearing before the Board, Clawson indicated it had not been present on July 16, 1992 when the clarification had been made and had not had an opportunity to tell the Board why it was unable to produce the chain of custody information. Clawson presented evidence that from July 21, 1992 through August 14, 1992, the Company attempted to obtain the chain of custody documents. On August 14, 1992, the Company had obtained the chain of custody documents and had notified the Union of this. The Company requested that therefore it be allowed an extension of time to provide the chain of custody documents based on good cause shown. The Company contended they vigorously attempted to obtain the chain of custody documents, and it was only after they continued to pursue these matters that they were able to obtain them. The Board deadlocked over Clawson's request, and the outcome of the February 18, 1993 meeting was marked, "Deadlocked."
 
 
 18
 The CBA provides that if the Grievance Board is deadlocked, either party may request that the matter be referred to arbitration, and if arbitration is not requested, "the grievance shall be considered acted upon and closed." Art. X Sec. H. In the present case, neither party requested arbitration.
 
 
 19
 Eight months later, the Union filed suit in the United States District Court for the Eastern District of Michigan on October 9, 1993, seeking enforcement of the May 19, 1992 order, and an order of reinstatement for Charles Long to his former position with full back pay, benefits and seniority.
 
 
 20
 Defendant Clawson argued before the district court that there was no final decision in regard to grievant Long because the deadlocked decision of February 18, 1993 had not been referred to arbitration. Defendant made a motion for summary judgment based on failure to exhaust administrative remedies, which the district court granted on March 16, 1994. Plaintiff filed a motion for reconsideration, which was denied. Plaintiff timely appealed.
 
 II.
 
 21
 We must decide whether the district court erred in dismissing the complaint for failure to exhaust administrative remedies. When a collective bargaining agreement sets forth a grievance and arbitration procedure, an employee must exhaust all contractual procedures and remedies prior to instituting a lawsuit under Sec. 301 of the Labor Management Relations Act of 1947 as amended, 29 U.S.C. Sec. 185. Republic Steel Corp. v. Maddox, 379 U.S. 650, 659 (1965); Atkins v. Louisville and Nashville R. Co., 819 F.2d 644, 649 (6th Cir.1987); Crawford v. TRW, Inc., 815 F.Supp. 1028, 1036 (E.D.Mich.1993). In the present case, the Union appropriately commenced its grievance by utilizing the grievance machinery provided by Article X of the collective bargaining agreement. However, the parties disagree over how the last decision of the Grievance Board, the February 18, 1993 decision, should be interpreted.
 
 
 22
 Defendant argues that this last decision of the Board resulted in a deadlock and pursuant to Article X Sec. H of the CBA, the decision then had to be referred to arbitration to resolve the deadlock, which the Union failed to do. Defendant Clawson maintains it is entitled to dismissal or summary judgment because as to "the last decision by the Board on this matter," Local 247's sole remedy was to seek arbitration of the panel's February 18, 1993 deadlock.
 
 
 23
 Plaintiff argues that it is entitled to seek judicial enforcement of the decision rendered on May 19, 1992, which was merely "clarified" on July 16, 1992, and again "presented" on February 18, 1993, but was the final and binding decision pursuant to the agreement between the parties. Therefore, the decision was functus officio, or "a task performed," a doctrine which has traditionally been applied to prevent arbitrators from revisiting decisions they have rendered.
 
 
 24
 The district court found that the Union failed to exhaust all of its contractual remedies prior to filing suit in federal court and dismissed the complaint based on the following analysis.
 
 
 25
 An initial decision was rendered by the Board on May 19, 1992. The Union sought clarification of the Joint Grievance Board's May 19, 1992 decision, and such clarification was received on July 16, 1992. Thereafter, for reasons not provided to the district court or set forth in the minutes of the February 18, 1993 Grievance Board meeting, the Union resubmitted the issue to the panel for further consideration and clarification of the July 16, 1992 decision. At the hearing on February 18, 1993, defendant Clawson presented evidence on why the chain of custody documents were not provided within 10 days as required by the May 19, 1992 decision, and requested an extension of time to provide such documents "based on good cause shown." The Grievance Board panel deadlocked on whether the Company should be granted its request.
 
 
 26
 Section H of Article X of the CBA provides that if the Board vote fails to produce a majority and results in a deadlock, either party may, within five days after the meeting, seek arbitration. "If neither party requests arbitration, the grievance shall be considered acted upon and closed." Neither party sought arbitration within five days of the February 18, 1993 decision. Instead, almost seven months later, the Union instituted the present lawsuit in district court.
 
 
 27
 In its opinion of March 16, 1994, the district court stated:
 
 
 28
 Local 247 claims that the arbitral decision rendered May 19, 1992, "clarified" on July 16, 1992 and again "presented" on February 18, 1993 is "final and binding on all parties" as provided by section F of Article X. The use of the words "clarify" and "present" however, do not negate the fact that the union continued to pursue the grievance. By requesting the matter be placed back on the docket at the February 18, 1993 Board meeting, the union in effect opened up the proceedings for further consideration by the Board. Local 247 had no problem employing the grievance procedures on July 16, 1992, and February 18, 1993 to achieve what it believed would be favorable results. The same procedures, however, bind Local 247, no matter what the outcome. When the Board deadlocked over Clawson's request for an extension of time to produce the chain of custody documents, Local 247's sole remedy was to seek arbitration. By not seeking arbitration, the union failed to exhaust its grievance remedies as provided for in Section F. Accordingly, its complaint must be dismissed.
 
 
 29
 We agree with this analysis. We find that the May 19, 1992 decision of the Grievance Board was not functus officio, as plaintiff contends. The Company's letter of May 29, 1992 indicates the Company had reason to believe it could not obtain a complete chain of custody form because the Company was informed by three people involved in the drug testing that a federal regulation prohibited release of chain of custody documents. Although the letter cites the wrong regulation, the correct regulation, 49 CFR Sec. 40.33, prohibits MRO's from disclosing to a third party medical information provided by an individual to the MRO as part of the drug testing verification process. Therefore, we believe there is evidence that defendant Clawson was unable to obtain the chain of custody information when initially requested.
 
 
 30
 Moreover, the Company did provide an edited chain of custody form, together with a statement from medical review officer Hanna, indicating that everything had been done according to the proper protocol and procedure. The letter from Hanna stated, "In reviewing the chain of custody and in following up with the patient to confirm the substance all proper DOT regulations were followed." The Company contended that this ought to suffice in regard to the chain of custody issue, and we believe the Board had the right to consider this contention, when asked to clarify its initial order.
 
 
 31
 It is not clear whether the Board was aware of the Company's May 29, 1992 letter at the meeting held on July 16, 1992, when the Union presented its request for clarification. Mr. Jerome, to whom the letter was sent, was not a member of the decision-making panel, and we do not know whether he passed the letter on to the panel when he received it, or whether he reminded the panel of its contents on July 16, 1992. It is undisputed, however, that the Company did not receive notice of the July 16 meeting, and did not have a representative present. Therefore, the Company was not given an opportunity to argue its position. Moreover, the July 16, 1992 decision fails to address the Company's contention that the edited copy of the chain of custody form, coupled with the Hanna statement, should have sufficed. Based on these facts, we believe there is evidence to support the Company's contention that it made a good faith effort to obtain the chain of custody documents from various sources, but was thwarted, at first, by a federal regulation.
 
 
 32
 At the hearing of February 18, 1993, Clawson presented further evidence that from July 21, 1992 through August 14, 1992, the Company attempted to obtain the chain of company documents. Grievant Long, on the other hand, never requested that his split sample, which was available, be tested for marijuana. The Union was the party which sought a further clarification of the Board's decision on February 18, 1993, but now is trying to avoid the impact of the deadlocked decision of February 18, 1993, and to return to the earlier decision of May 19, 1992. Because of defendant Clawson's intervening letter of May 29, 1992, and the requests for clarification in light of this letter, we do not believe the May 19, 1992 decision was a final decision.
 
 
 33
 The final decision of the Board was made on February 18, 1993 and indicated that the Board was deadlocked. Under the CBA, Art. X Sec. H, a deadlock has to be resolved by submitting the case to arbitration, which the Union failed to do. Because the Union did not submit the deadlocked decision to arbitration, the Union failed to exhaust the grievance remedy provided for in the CBA and the case was properly dismissed for failure to exhaust administrative remedies. Republic Steel Corp., 379 U.S. at 659.
 
 
 34
 For these reasons, the district court is hereby AFFIRMED.
 
 
 35
 RYAN, Judge, dissenting.
 
 
 36
 Although the majority opinion concludes that the May 1992 decision of the Joint Grievance Board was not functus officio, its reasoning is, to me, unclear. It appears that the majority is persuaded that Clawson Concrete had legitimate reasons for not providing the chain of custody form which it did not have adequate opportunity to explain to the Board, and that the majority's certainty on these points leads it to conclude that the May 1992 decision was not final and binding, and thus appealable by Local 247. I disagree both with the majority's understanding of the facts, and with its legal conclusions regarding the significance of those facts. I, therefore, respectfully dissent.
 
 I.
 
 37
 Long's grievance was presented to the Joint Grievance Board on May 19, 1992. Several arguments were presented on Long's behalf, among them an argument that the proper testing procedures were not followed and that the chain of custody was not properly documented. At this hearing, Clawson Concrete presented the "edited" chain of custody form to which the majority opinion refers.
 
 
 38
 In response to the parties' arguments, the Board issued the following decision at the May 19 proceedings:
 
 
 39
 Within ten (10) days, the company shall provide the chain of custody form to the union business agent and to the grievant for their review. If there are any inconsistencies or errors in this chain of custody, grievant will be reinstated and made whole for time lost.
 
 
 40
 By ordering Clawson Concrete to submit the unedited chain of custody, the Board's decision plainly indicates that the edited chain of custody form that Clawson Concrete presented was considered by the Board to be insufficient. Thus, when the majority asserts that the Joint Grievance Board had the right to consider, in February 1993, Clawson Concrete's contention that the edited chain of custody was sufficient, the majority necessarily ignores that the Joint Grievance Board had already considered and rejected that contention.
 
 
 41
 Ten days following the May 19 decision, rather than providing the unedited chain of custody, Clawson Concrete sent a letter to the Board, claiming that it was "legally unable to comply with the decision put forth by the board relative to the chain of custody form.... [I]t has been determined that ... DOT Regulations require that only the medical review officer hold possession of the final chain of custody document, and that document should not be released to any person or entity without a subpoena." The majority appears to accept this as a valid excuse, but in so doing, overlooks strong indications that the proffered legal rationale was without foundation. Clawson Concrete apparently meant to refer to regulations at 49 C.F.R. Secs. 40.29, 40.33, since, as the majority acknowledges, the regulation it actually cited does not exist. Even those regulations, though, contain no requirement purporting to forbid a medical review officer (MRO) from turning over chain of custody information in the absence of a subpoena, despite Clawson Concrete's claims. While versions of 49 C.F.R. Sec. 40.33(h) in 1991 and 1992 (there have since been amendments) provided that "the MRO shall not disclose to any third party medical information provided by the individual to the MRO as a part of the testing verification process," this provision has nothing to do with providing the chain of custody information. First, it relates only to personal information provided by the tested individual--that is, Long--and not to the laboratory's own chain of custody information. This is clarified elsewhere in the regulation. Second, it is Long who requested the information, not a third party. Thus, there is ample reason to view Clawson Concrete's excuse with suspicion.
 
 
 42
 In any event, upon learning of the alleged legal prohibition on providing the chain of custody information, Local 247 approached the Board with a request for a clarification of the May 19 decision. According to the Board, "[t]he Union asked if the grievance decision meant to cover the situation where the company refused to provide the chain of custody form to the business agent and to the grievant for their review." The Board's decision, rendered on July 16, was as follows:
 
 
 43
 While implicitly grievance decision of May 19, 1992, did cover the situation, same can be clarified. At the end of the first paragraph of the DECISION the following sentence should be added:
 
 
 44
 If the company fails to provide chain of custody documentation, then the grievant shall be reinstated and made whole for time lost.
 
 
 45
 The majority contends that the record is not clear whether the Board was aware of Clawson Concrete's May 29 letter at the time it issued this decision, thus suggesting that Clawson Concrete was unfairly deprived of an opportunity to argue the merits of its position. As I will discuss below, the record belies this contention.
 
 
 46
 Local 247, after receiving the favorable clarification of July 16, proceeded to again "request[ that] the matter be placed on the Board's docket for further clarification of its decision," for reasons not reflected in the record. At the same time, Clawson Concrete "requested that it be allowed to present evidence as to why it failed to provide the chain of custody information within ten days." On February 18, 1993, the Board accordingly issued another decision. It first summarized its earlier decisions, and in so doing, made clear that it had been fully aware at the time of its July 16 decision of Clawson Concrete's proffered excuse for its nonproduction:
 
 
 47
 If the company fails to provide the chain of custody documentation, then grievant shall be reinstated and made whole for time lost. Within 10 days of receipt of the grievance decision, the company notifies the grievance panel that it could not provide the chain of custody documentation. It advised that it could not get the documentation and had checked with severals [sic] who verify that they were unable to legally obtain the chain of custody documents unless litigation had been started.
 
 
 48
 (Emphasis added.) Thus, despite the majority's contention, the Board's own summary of events affirms that the Board was informed of Clawson Concrete's position at the time it issued its July clarification, despite Clawson Concrete's not having attended the hearing. Accordingly, the Board's clarification, holding Clawson Concrete to the terms of the original decision, was made with full knowledge and understanding of the surrounding circumstances.
 
 
 49
 The Board stated that Clawson Concrete was now "request[ing] that it be allowed an extension of time to provide the chain of custody documents based on good cause shown. The company contends they vigorously attempted to obtain the chain of custody documents. It was only after they continued to pursue these matters that they were able to obtain the same." In other words, it appears that Clawson Concrete obtained the documents at some point, sans subpoena, despite its earlier claims of a legal prohibition, thus casting further doubt on the validity of its original excuse.
 
 
 50
 Following this chronology, the Board simply made a notation that it had "[d]eadlocked." The Board neither provided a substantive discussion of the issues, nor mentioned the substance of Local 247's requested clarification, nor reached a decision with regard to the Local 247 request.
 
 
 51
 As this recitation makes plain, I strongly disagree with the majority's interpretation of events, and its resulting portrayal of Clawson Concrete as an unfortunate victim of Board procedures gone awry. Clawson Concrete's excuse for not producing the chain of custody is meritless, and, moreover, the record shows that the Board understood Clawson Concrete's position when it clarified the May 19 order as requiring production. But, as I will discuss below, even if the facts were as the majority contends, the legal conclusion would be unaltered: the May 19 order was functus officio, and thus appealable by Local 247.
 
 II.
 
 52
 Local 247 argues that the Board's decision of May 19 was final and binding, and that the subsequent decision on July 16 was merely a clarification that did not work any substantive change. It takes the position that Clawson Concrete's requested relief in February 1993, an extension of time, was fundamentally different from Local 247's requests for clarifications, because Clawson Concrete essentially asked for a revision of the original order. Local 247 contends that Clawson Concrete was prohibited from asking for a revision, and since the request itself was illegitimate, the deadlock as to Clawson Concrete's February 1993 request is insignificant. Thus, the May 19 order continued to stand as a final and binding order, from which it was appropriate to file an action requesting enforcement.
 
 
 53
 Local 247 relies on the doctrine of functus officio in support of its arguments. Functus officio, "a task performed," is a doctrine which has traditionally been applied to prohibit arbitrators from revisiting decisions they have rendered; having fulfilled their arbitral function, they are said to have no authority to reconsider an award. BLACK'S LAW DICTIONARY 673 (6th ed. 1990). Although many rationales for the doctrine have been cited, the strongest is the danger of ex parte communications. "Once they return to private life, arbitrators are less sheltered than sitting judges, and it is feared that disappointed parties will bombard them with ex parte communications and that the arbitrators, not being professional judges or subject to the constraints of judicial ethics, will yield...." Glass, Molders, Pottery, Plastics and Allied Workers Int'l Union v. Excelsior Foundry Co., 56 F.3d 844, 847 (7th Cir.1995).
 
 
 54
 Functus officio is a rather obscure doctrine that has been only sporadically addressed by the courts, especially in the labor context. E.g., NFL Players Assn. v. Pro Football, Inc., 56 F.3d 1525 (D.C.Cir.1995); Trade & Transport v. Natural Petro. Charters Inc., 931 F.2d 191, 193-95 (2d Cir.1991). Indeed, only one Sixth Circuit case has ever addressed the doctrine. In IMA v. Amalgamated Workers, Local Union No. 383, 725 F.2d 406 (6th Cir.1984), the court agreed to enforce part of an arbitrator's award, and to "excise" the portion making a monetary award to discharged employees, on the grounds that the award was not "derived in [a] rational way from the collective bargaining agreement." Id. at 412. It then remanded the case to the arbitrator for a consideration of the propriety of a backpay award. Id. In doing so, the court noted the following:
 
 
 55
 We recognize that this disposition might not have been possible under the common law of arbitration contracts. Generally, the common law required courts either to vacate or to enforce the award in whole; courts could not remand a portion of the award to the arbitrator for reconsideration. This rule was based on the notion that after an arbitrator has rendered an award, his contractual powers have lapsed and he is "functus officio." This rule, however, has its limits. A remand is proper, both at common law and under the federal law of labor arbitration contracts, to clarify an ambiguous award or to require the arbitrator to address an issue submitted to him but not resolved by the award.
 
 
 56
 Id. at 412, n. 3 (emphasis added) (citations omitted). In other words, functus officio allows an arbitrator to revisit an award for the purpose of clarifying it, but it does not permit revisiting an award for the purpose of reconsidering its merits. This reading supports Local 247's interpretation of the doctrine, and its effect in this case: Local 247's request for a clarification was proper under the doctrine, while Clawson Concrete's request for reconsideration was not.
 
 
 57
 The IMA case expressed some doubt, however, about the propriety of applying the doctrine in the labor context. It cautioned that common law rules of arbitration, such as functus officio, do not automatically apply to actions to enforce labor arbitration awards brought pursuant to section 301 of the LMRA. Id. A court must consider the extent to which a common law rule furthers "the substantial federal policy of making arbitrator's awards final," as that policy must take precedence over any other. Id.
 
 
 58
 The IMA court was quite plainly correct; it is the duty of federal courts to fashion and apply a substantive body of federal labor law in proceedings under section 301. See Textile Workers v. Lincoln Mills, 353 U.S. 448, 456-47 (1957). That does not mean a court reviewing a section 301 claim is obliged to dispose of all common law doctrines; it must do so only to the extent they conflict with federal labor policy. Indeed, although the IMA court concluded that, in its case, it could remand a particular issue that an arbitrator had incorrectly decided, even though this action might conflict with the traditional functus officio doctrine, it did not suggest that the doctrine as a whole was inapplicable in the labor context. Moreover, the case in no way expressed support for the proposition that a party, as opposed to a court, may request an arbitrator to reconsider already-decided issues, as Clawson Concrete did here.
 
 
 59
 In my view, application of the functus officio doctrine in the manner requested by Local 247 is entirely in accord with the policy, cited by the IMA court, of making arbitrator's awards final. See Colonial Penn Ins. Co. v. Omaha Indem. Co., 943 F.2d 327, 332 (3d Cir.1991). A clarification of the Board's decision is fundamentally different from what Clawson Concrete requested; Clawson Concrete wanted the Board to change the substance of what it had already ordered. Indeed, Clawson Concrete's actions can perhaps best be characterized as an attempt to simply wear down the panel.
 
 
 60
 In this regard, I believe that the apparent invalidity of Clawson Concrete's excuse for the nonproduction of the chain of custody, and the plain indication by the Board that it was well aware of Clawson Concrete's position at the July hearing, are significant. Clawson Concrete had its day in court, as it were, in May, and it lost. But even if, as the majority believes, Clawson Concrete's excuse was made in good faith, and the Board was unaware of the excuse at the time of the July hearing, the doctrine of functus officio requires an identical conclusion. The July decision did not represent any change in the substance of the May order, nor did the clarification request in any way seek such a change. As the Board itself suggested, Local 247's requested clarification was unnecessary, because the Board's original decision made perfectly plain that, even if Clawson Concrete could not obtain the chain of custody, Long was to be reinstated. But for Clawson Concrete to ask, in February, for a post hoc extension of time to provide the chain of custody information was to ask for a substantive change. Clawson Concrete's request was, instead, simply an unadorned attempt at a second--or, indeed, in my view, a third--bite at the apple. The May order provided ten days for the necessary production, and Clawson Concrete took longer than that. In July, the Board clarified that the order included within its scope the circumstances under which Clawson Concrete claimed it was forced to refuse to provide the information. Essentially, in its February request for extension of time, Clawson Concrete was attempting to overturn an adverse award; it was requesting relitigation of the original issue, and it wished to convince the Board that its original decision, and subsequent clarification, were erroneous.
 
 
 61
 Moreover, it is significant that--judging from the limited portions provided by the parties in the Joint Appendix--the collective bargaining agreement does not appear to provide a mechanism for the Board to review the substance of its own prior decisions. There is no indication that the parties wished to depart from the usual common-law rule of functus officio, and I think it is reasonable to presume that had reconsideration by the Board been desired by the parties, they would have authorized it. Cf. Glass, Molders, 56 F.3d at 848.
 
 
 62
 Finally, even if Clawson Concrete's request to revisit the earlier decision was for a legitimate purpose--such as clarification, or to address an unforeseen contingency--it should be required to make such a request in a timely manner. Cf. id. Here, the February 1993 hearing occurred some nine months after the Board's original decision, and seven months after its clarification. While I do not suggest a bright line rule as to what period of time is unreasonable, there can be no serious debate that nine months certainly is.
 
 
 63
 In sum, the differences between the requests of Clawson Concrete and of Local 247 are significant; Clawson Concrete's behavior brought to bear precisely the type of coercion that the functus officio doctrine sought to avoid. While the record in no way suggests that Clawson Concrete made improper ex parte contacts of the arbitrators, its conduct brought an analogous pressure to bear. Arbitrators cannot be asked to field repeated requests to decide a particular issue in a certain way, when there is no basis on for such a request other than a desire for a different ruling.
 
 
 64
 Accordingly, I believe that the May 1992 decision, as clarified in July 1992, was a final and binding decision, subject to enforcement by the district court, and I would reverse the district court's order of dismissal.
 
 
 
 [1]
 A split sample was not taken at the collection site. Instead, a split sample was taken at the NIDA lab and a portion of that was frozen in accordance with Article XXIV, Sec. G. Grievant Long was told that the split sample was available for testing. However, he did not present evidence that he sought to have the split sample tested