James MAKSIN, Plaintiff,

v.

UNITED STEEL WORKERS OF AMERICA, Local 2227, AFL–CIO, CLC and United States Steel, a Division of USX Corporation Irvin Works, Defendants.

No. CIV. A. 99–1215.

United States District Court,
W.D. Pennsylvania.

Sept. 15, 2000.

Leonard E. Sweeney, Angelo E. Quaranta, Pittsburgh, PA, for James Maksin.

Angela E. Pace, United Steelworkers of America, Pittsburgh, PA, for United Steel Workers of America, Local 2227, AFL–CIO, CLC.

Gary R. Kelly, Anthony F. Jeselnik, Pittsburgh, PA, for United States Steel, a Division of USX Corporation, Irvin Works.

## OPINION and ORDER OF COURT

AMBROSE, District Judge.

Pending before this court are two Motions for Summary Judgment by Defendants United States Steel and the United Steelworkers of America, Local 2227. For the reasons set forth below, the Motions are GRANTED in their entirety.

## I. INTRODUCTION

### A. Factual Background

This is a "hybrid § 301" action brought by Plaintiff James Maksin under the Labor–Management Relations Act, 29 U.S.C. § 185, against Plaintiff's employer, United States Steel, a division of USX Corporation ("USS"), for breach of three agreements allegedly controlling overtime provisions at the USS Irvin Plant and against the United Steelworkers of America, Local 2227 ("Local 2227" or "the Local"), for breach of its duty of fair representation. Mr. Maksin seeks to remedy the loss of available overtime employment, lost wages and attendant benefits, allegedly preserved for him by a collective bargaining agreement and local agreements in effect at the time of the violations. (Complaint, "Compl.," ¶¶ 1–2.)

Mr. Maksin was hired first as a laborer then as a utilityman by Defendant USS beginning in 1994 and became a member of Local 2227. (Brief in Support of Mot. for Summ. J. by Def. USS, "USS Brief," Docket No. 17, at 2–3.) Two agreements between USS and Local 2227 controlled working conditions for employees at the USS Irvin Plant. The first was a Basic Labor Agreement, that is, the collective bargaining agreement between USS and the United Steelworkers of America ("USWA") Production and Maintenance Employees which addressed, among numerous other matters, overtime provisions for union members (the "BLA," Compl. Exh. A, specifically § § 10(H) and 11). The second document was an overtime distribution agreement (the "Overtime Agreement," Compl. Exh. B) which set out a method by which opportunities for overtime would be distributed among certain employees without regard to seniority. (USS Brief at 3.) Mr. Maksin also alleges that a third document, which he terms a "remanning agreement," controlled certain

aspects of employee overtime. (Compl. at ¶ 10, Exh. C.)

The USS Irvin Water Circulation and Treatment Department, where Mr. Maksin is employed in the Central Maintenance Department, consists of a River Pump House, the "South Plant" and the "North Plant" (the "water plants") where water used in finishing steel is filtered and recycled. (USS Brief at 4.) The water plants are manned by three levels of employees— team leader, operator, and utilityman; these positions are classified and paid in that order from highest to lowest. (*Id.*) A water plant is a twenty-four-hour-a-day, seven-day-a-week operation, requiring 21 "turns" or eight-hour shifts for each position. This is accomplished by having four employees work five turns each, with the extra turn covered by an employee working overtime. Temporary vacancies among water plant employees such as vacations are also covered by other employees working overtime. (*Id.*)

During the period 1996 to 1998, USS management considered the possibility of automating its South Plant, a move which would mean the eventual loss of three jobs. (Mem. in Supp. of Def. Local 2227's Mot. for Summ. J., "Local Mem.," Docket No. 15, Deposition of James Maksin, "Maksin Dep.," at 96–98.) Because USS and Local 2227 did not want to hire individuals they knew might be laid-off within a short time, the practice was for water plant management to schedule regular overtime for the plant employees, which included moving utilitymen into plant operator positions to cover the temporary staffing short-fall. (*Id.*) In 1998, USS decided not to automate the South Plant. (USS Brief at 5.) As soon as this became known, several employees who were classified as laborers grieved the Local to require USS to post job openings for full-time positions as utilityman in order to fully staff the operation. (Maksin Dep. Exh. 12.) Local 2227 supported the move as part of its general policy of encouraging company efforts that give employees an opportunity to move into higher paying classifications. Addition of the two positions was also consistent with the "letter and spirit" of the BLA. (BLA § 10(H) and 13(H); USS Brief at 5.) USS resolved the grievance by posting bids for two new utilityman positions on October 6, 1998. (Compl. ¶ 12.)

When the positions were filled, opportunities for overtime became severely constrained and Mr. Maksin was no longer able to work the extensive overtime he had in the past.[1] He immediately attempted to file a grievance protesting these new positions but was informed by the Local's grievanceman, Michael Tawney, that his grievance had no merit and the Local would not challenge the postings. (USS Brief at 6; Maksin Dep. at 104–105.) Mr. Maksin then filed charges against USS and Local 2227 with the National Labor Relations Board (NLRB) alleging that the postings violated his rights under Section 7 of the National Labor Relations Act. These charges, which essentially duplicated the grievance, were dismissed by the NLRB. (Maksin Dep. at 144–145, Dep. Exh. 16 and 17.)

Between August 1998 and January 1999, Plaintiff and another utilityman (who is not party to this suit) filed a total of ten overtime grievances with Local 2227. (Compilation by the Court of Dep. Exh. 20–29.) At Step 2 hearings[2] held on Octo-

---

**1.** Even though Mr. Maksin was at the time the least senior employee in a group of 25 team leaders, operators, and utilitymen, he was able to accumulate considerable voluntary overtime under the terms of the Overtime Agreement, actually working more than a thousand extra hours in 1997–1999. Only one other worker exceeded this amount. (Maksin Dep. at 72 and Dep. Exh. 8.)

**2.** The Basic Labor Agreement sets out a three-step procedure for the grievance process. In

ber 28, 1998, January 28, 1999 and February 11, 1999, eight of the grievances were denied by USS and the Local refused to take them to Step 3 review because union officials concluded that the grievances had no merit.[3] (Local Mem., Aff. of Richard Pastore, "Pastore Aff.," ¶¶ 13–14.) Of the ten grievances, five protested the failure by USS management to move a utilityman up to cover temporary vacancies in the plant operator positions, thus reducing overtime available to utilitymen; three protested a utilityman being scheduled to work a six-day work week; one protested loss of overtime by allowing non-utilitymen to operate certain power equipment; and one protested the company's continuing violation of the Overtime Agreement. (Dep.Exh. 20–29.)

### B. *Procedural Background*

On August 2, 1999, Plaintiff brought a hybrid § 301 suit in this court. In his complaint, he first alleged that by posting the two utilityman positions, Defendant USS had breached the BLA, Overtime and re-manning agreements, which resulted in "reduction and dilution of overtime" that previously had been paid on a "regular and consistent basis." (Compl.¶¶ 19–21.) Second, he alleged that Local 2227 breached its duty of fair representation of him as a union member by failing to pursue, or by pursuing in "an arbitrary, haphazard and careless manner," the grievances he brought concerning the alleged violations of the remanning and overtime agree-ments by USS. Furthermore, he asserted that when Local 2227 did agree to present his grievances, they failed to adequately prepare for the hearings, "engaged in little or no investigation" regarding his concerns and were "reckless, careless and failed to give due consideration" to his grievances. (Compl.¶¶ 22–29.)

At the close of discovery, both Defendants moved for summary judgment (Local 2227 Mot. for Summ. J., Docket No. 14, and USS Mot. for Summ. J., Docket No. 16), pursuant to Fed.R.Civ.P. 56. USS argues that the suit is time-barred because it was filed more than six months after Plaintiff's cause of action arose and also that neither Defendant breached the Basic Labor Agreement or the Overtime Agreement by hiring two additional utilitymen or reducing the overtime opportunities available to Plaintiff. (USS Brief at 7, 9.) Local 2227 bases its motion on the same statute of limitations argument and on Plaintiff's lack of evidence of any breach of the duty of fair representation in the way Local 2227 handled the grievances listed in the Complaint. (Local Mem. at 8, 11.)

This court has jurisdiction pursuant to 28 U.S.C. § 1337 inasmuch as the action raises federal questions under the Labor–Management Relations Act.

### C. *Standard of Review*

A court may grant summary judgment if the party so moving can show, based on "pleadings, depositions, answers to inter-

---

Step One, the union grievanceman and plant division manager orally discuss the grievance and try to reach a settlement. If this is unsuccessful, the grievance moves to Step Two, a hearing among the grievanceman, the plant general manager and the grievant. If the company's response in Step Two is not satisfactory, the union can demand an appeal to the International Union representative and a company representative, i.e., Step Three. If no settlement occurs at Step Three, the International Union representative can appeal the decision by the company and send the grievance to arbitration. The decision to move up to the next step in the process is normally made by the union representatives. (BLA § 6(C).)

3. The ninth grievance was resolved at a Step 4 meeting in January 1999 and resulted in Mr. Maksin receiving overtime for eight hours. (Pastore Aff., ¶ 15.) The outcome of the tenth grievance is unclear.

rogatories, and admissions on file together with the affidavits, if any, ... that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *Rossetti v. Busch Entertainment Corp.*, 87 F. Supp.2d 415 (E.D.Pa.2000). If a reasonable jury could return a verdict for the non-movant, the dispute is genuine and if, under substantive law the dispute would affect the outcome of the suit, it is material. A factual dispute between the parties that is both genuine and material will defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In considering a motion for summary judgment, the court must view all the evidence in the light most favorable to the non-movant, accept the non-movant's version of the facts as true, and resolve any conflicts in its favor. *Rossetti, id., citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) and *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992). In short, the defendants must show that if the pleadings, depositions and other evidentiary material submitted to date were admissible at trial, the plaintiff could not carry its burden of proof based on that evidence and a reasonable jury would thus decide all genuine material disputes in the defendants' favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 318, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has demonstrated that there are no genuine issues of material fact, the burden shifts to the non-moving party to "make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by depositions and admissions on file." *Celotex, id.* at 322–23, 106 S.Ct. 2548; *Rossetti, id.;* Fed.R.Civ.P. 56(e).

The sum of the affirmative evidence to be presented by the non-moving party must be such that a reasonable jury could find in its favor, and it cannot simply reiterate unsupported assertions, conclusory allegations or mere suspicious beliefs. *Liberty Lobby, id.* at 250–252, 106 S.Ct. 2505; *Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir.1995).

## II. ANALYSIS

### A. Hybrid § 301 Actions

The phrase "hybrid § 301 action" refers to suits brought by an employee alleging breach of a collective bargaining agreement by the employer and, concurrently, breach of a union's duty of fair representation of the employee. A hybrid § 301 suit arises when an employee has a grievance against his employer for breach of the governing collective bargaining agreement and attempts to exhaust his grievance or arbitration remedies provided in that agreement, but the union representing the employee acts in such a "discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163–64, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983); *see also Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) and *Hines v. Anchor Motor Freight*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). The claims against the employer and the union are "inextricably interdependent" and, to prevail, the employee must prove the same case against both defendants. *DelCostello, id.* at 164–65, 103 S.Ct. 2281.

The statute of limitations for a hybrid § 301 action is six months, an adoption of the same statute of limitations for making a charge of unfair labor practices to the NLRB under § 10(b) of the Labor Relations Act. *DelCostello, id.* at 169, 171, 103 S.Ct. 2281. The Supreme Court has insti-

tuted a case-by-case factual standard to use in determining when the statute of limitations begins to run. *Clayton v. Int'l Union, United Auto., Aero., and Agric. Implement Workers of Am.*, 451 U.S. 679, 689–93, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981). The Third Circuit has held the limitations period begins to run when the plaintiff knows or reasonably should have known of the acts contributing to the union's wrongdoing in failing to adequately represent the member's interests. *Miklavic v. USAir, Inc.*, 21 F.3d 551, 556 (3d Cir.1994); *Scott v. Local 863, Int'l Bhd. of Teamsters*, 725 F.2d 226, 229 (3d Cir.1984). In a § 301 suit, a claim accrues against the company defendant at the same time it accrues against the union defendant, since the predicate for a § 301 action against an employer is proof that the union breached its duty of fair representation. *Belic v. General Motors Corp.*, 588 F.Supp. 633, 637 (S.D.Oh.1984).

### B. *Statute of Limitations Issues*

To determine if Plaintiff brought his suit in a timely manner, it is necessary to divide his claim into two parts. Mr. Maksin's first claim is based upon the union's refusal to grieve the posting of the utilityman positions, the second is based on the grievances Plaintiff filed that actually entered the grievance process.

#### 1. *Refusal of Local 2227 to Grieve the Utilityman Postings*

When USS posted the two utilityman positions on October 6, 1998, Plaintiff attempted to file a grievance for lost overtime with the grievanceman for Local 2227, Mike Tawney, pursuant to the procedures set forth in the Basic Labor Agreement. (Maksin Dep. at 104–105.) Tawney refused to pursue Mr. Maksin's grievance because just a few weeks earlier, on July 13, 1998, the same Local had filed a grievance on behalf of a group of lesser-paid laborers demanding that the positions be

created and filled once the question of automating the South Water Plant was resolved. The Local understandably found it internally inconsistent to first grieve for the jobs to be posted and then grieve to have that same posting removed. (Pastore Aff., ¶¶ 4–6.)

If, as Plaintiff alleges, Local 2227 breached its duty of fair representation by failing to grieve the posting of the utilitymen positions on behalf of Mr. Maksin, it is clear from Plaintiff's own testimony that Tawney told him no later than October 6, 1998, that the union would not pursue this grievance. (Maksin Dep., 104–105, 134–136). Plaintiff argues that the point in time when he became aware of the union's breach of the duty of fair representation, which consequently started the statute of limitations running, is a question of fact for the jury. (Plf.'s Brief In Opp'n to Mot. for Summ. J., "Plf.'s Brief," at 5.) For this proposition, Plaintiff cites to, among other cases, *Samples v. Ryder Truck Lines, Inc.*, 755 F.2d 881, 887 (11th Cir.1985) (knowledge is an issue that *normally* would be an issue of fact). However, the court in *Samples* immediately makes the following observation about suits such as this which are based on the union's supposed breach by failing to pursue grievance procedures that are still available:

> In such cases, knowledge can normally be attributed to the employee when his union notifies him of its decision not to pursue his claim any further, or when he should by normal diligence have realized that it made such a decision.

*Id.* at 887, n. 7, *citing Scott, id.* at 229.

Mr. Maksin knew the Local would not pursue this matter through the grievance process on October 6, 1998. This case was filed on August 2, 1999, some ten months later. Therefore, any claim Plaintiff might have had for damages stemming from Local 2227's refusal to pursue his grievance

regarding posting of the two new utility-man positions is time-barred.[4]

Even if I did not conclude that this portion of Mr. Maksin's claim is time-barred, the mere fact that the Local refused to grieve the postings would not have breached its duty of fair representation. *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) (concluding that "a wide range of reasonableness" is available to union officials who act with "good faith and honesty of purpose" in making decisions on behalf of individuals and classes of employees, even if such decisions do not benefit all represented employees equally). Furthermore, as I conclude below, USS did not violate the Basic Labor Agreement or the Overtime Agreement by posting the positions.

### 2. Plaintiff's Grievances That Entered the Grievance Process

For the Plaintiff's grievances which the Local did pursue on his behalf, Mr. Maksin argues the statute of limitations did not begin to run until February 1, 1999, the date he "became unequivocally aware" that the company denied the grievances at Step Two and the Local refused to demand that the matter move to consideration by the union's International Staff Representative. (Plf.'s Brief at 5.)

The Supreme Court has held that ordinarily, when the collective bargaining agreement has a grievance procedure, the aggrieved worker must at least attempt to exhaust his contractual remedies before suing in federal court. *Republic Steel Corp.' v. Maddox,* 379 U.S. 650, 652, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). Here, the Plaintiff properly took his grievance into the grievance procedure as stipulated by the Basic Labor Agreement Section 6, "Adjustment of Complaints and Grievances." Even though Mr. Maksin's grievances were denied at Step Two by USS at a hearing on January 28, 1999, Plaintiff took them to Step Three where Richard Pastore, the USWA International Staff Representative, reviewed them and refused to demand arbitration because he believed they had no contractual basis. (Pastore Aff., ¶¶ 10–11.) Pastore's denial to move to arbitration occurred in March 1999. Neither Mr. Pastore personally nor the United Steelworkers of America is a defendant in this suit.

■ A cause of action for the breach of the duty of fair representation accrues at the point where the grievance procedure has been exhausted or otherwise breaks down to the employee's disadvantage. *Fajardo v. Foodtown Supermarkets,* 702 F.Supp. 502, 507 (D.N.J.1988). In the present case, Local 2227 followed the procedures laid out in the Basic Labor Agreement and took Plaintiff's grievance through Step Two. At that time, USS denied the grievances and the procedure was exhausted for Local 2227. Mr. Maksin admits that he was aware of the Local's decision on February 1, 1999. (Maksin Brief at 5). Thus, the six-month statute of limitations period would expire on August 1, 1999; because that date was a Sunday, filing of the suit on August 2, 1999, is considered timely. Therefore, with regard to Mr. Maksin's grievances that entered

---

4. Plaintiff argues that the statute of limitations should be tolled, either because he may have been "lulled" by the Local into believing that it might reconsider its refusal to grieve the postings after the NLRB decision was handed down or, alternatively, that the NLRB appeal process itself was enough to toll the statute. However, he offers not one scintilla of evidence that he was lulled into not filing suit by the Defendants, and his second proposition directly contradicts established jurisprudence on hybrid § 301 actions, which clearly allow a union member who believes he has not been fairly represented by his union to commence an action without having exhausted administrative appeals. *Vaca, id.* at 185, 87 S.Ct. 903, *Clayton, id.* at 694, 101 S.Ct. 2088.

the grievance process, I conclude that Plaintiff's suit does not violate the statute of limitations.

### C. *Local 2227's Breach of its Duty of Fair Representation*

Mr. Maksin claims Local 2227 handled the grievances that entered the grievance process in a reckless and careless manner and without due consideration. (Compl.¶¶ 24–27.) A labor union, including its local representative, has a statutory duty to represent fairly all the workers it represents. *Vaca, id.* at 177, 87 S.Ct. 903. This duty of fair representation includes an obligation to serve the interests of the members without hostility or discrimination, to exercise its discretion in good faith, and to avoid arbitrary conduct. *Id.* The union cannot give only perfunctory review to grievances filed by employees. *Id.* at 191, 87 S.Ct. 903.

■ Local 2227 argues that Plaintiff can offer no evidence to show Local 2227 handled the grievances that were taken into the grievance process in an arbitrary, reckless, careless way. (Local Memo at 11.) The Defendant is correct. In his Brief in Opposition to the Motions for Summary Judgment, Plaintiff offers no evidence to support his allegations regarding the Local's actions on his behalf and without such evidence, Plaintiff cannot show that Defendant's representation was arbitrary or perfunctory. *Ash v. United Parcel Service Inc.*, 800 F.2d 409, 411 (4th Cir.1986) (union's conduct must be "grossly deficient," i.e., more than simple negligence, ineffectiveness or poor judgment). In fact, Local 2227 took the grievances through Steps One and Two, the only steps available to it. (BLA, Section 6, at 40–41.) Moreover, assuming Mr. Maksin's allegations that his grievances had merit are true, such an assumption does not necessarily lead to a conclusion that the Local breached its duty. *Vaca, id.* at 195, 87 S.Ct. 903 ("the duty of fair representation is not breached merely by proof that the underlying grievance was meritorious").

Plaintiff also claims that the duty of fair representation was violated because local grievanceman Mike Tawney was motivated by hostility and other improper motives and "had it out for him." (Maksin Dep. at 160.) When Mr. Maksin told Tawney that despite the union's refusal to accept the grievance of posting the positions, he would take the matter to the NLRB, Tawney allegedly said "go ahead," and, according to Plaintiff, Insinuated that he wanted to "beat the hell out of" Maksin. By his own testimony, Mr. Maksin acknowledges that Tawney made no further comments or threats to him after that one incident. (*Id.*)

The finding of animosity on the part of a union representative alone does not constitute a breach of the duty of fair representation, but rather, Plaintiff must establish that the way in which the union handled his grievance was "materially deficient." *Early v. Eastern Transfer*, 699 F.2d 552, 556 (1st Cir.1983). If the union representative was shown to be hostile to the plaintiff and his decisions about the grievance were influenced by his hostility rather than by appropriate considerations, it would be clear that the union breached its duty of fair representation. *Freeman v. O'Neal Steel Inc.*, 609 F.2d 1123, 1127 (5th Cir.1980). But Mr. Maksin offers no evidence, other than the alleged insinuation itself, that the hostility Tawney allegedly showed him negatively affected the manner in which his grievance was handled by Local 2227. In fact, Plaintiff acknowledges that at the Step Three meeting, in which the district representatives decide whether to arbitrate the grievances, Tawney and the other grievanceman for Local 2227 fought for some of his grievances to remain in the process. (Maksin Dep. at 163.)

Plaintiff points to a number of decisions by the NLRB in his Brief to support his argument that the Local failed in its duty to fairly represent him, but cases like *Graphic Arts International Union 96 B (Williams Printing Company) v. Deaton,* 235 NLRB 1153, 1978 WL 7495 (1978), establish only that a union cannot resort to coercion in order to restrict the right of a member to file charges with the Board. In fact, *Graphic Arts* specifically notes that

> in determining whether conduct amounts to restraint or coercion ... the test is an objective, rather than a subjective, one and depends on whether ... the probable effect of the conduct is to restrain or coerce an employee.

*Id.* at 2–3.

Plaintiff claims someone told him that Tawney "had it out" for him, but this supposed threat clearly did not deter Mr. Maksin from filing his case with the NLRB or coerce him not to file. Plaintiff promptly did so, on October 19,[5] according to his own testimony and copies of the charges filed against both Defendants. (Maksin Dep. at 160, 144–145, Dep. Exhs. 16 and 17.) If Mr. Maksin felt threatened by Tawney as to any other aspect of his appeal to the NLRB, he has failed to produce evidence of it.

Therefore, on the issue of whether Defendant Local 2227 breached its duty of fair representation with regard to the ac-

tions it took on behalf of the Plaintiff for those grievances that entered the grievance process available to the Local under the Basic Labor Agreement, I conclude that Defendant appropriately took all avenues available to it, i.e., through Step Two of the process. Plaintiff has failed to offer *any* evidence, much less evidence "sufficient to establish the existence of every element essential to his case" (*Celotex, id.* at 322–23, 106 S.Ct. 2548), to show that the actions of Local 2227 with regard to his grievances were arbitrary, reckless or haphazard.[6] Therefore, summary judgment will be granted to Defendant Local 2227 as to the claim of breach of duty of fair representation. While this decision alone would be sufficient to dismiss Plaintiff's hybrid § 301 action because such a claim depends on finding both employer and union liable for breach of contract and breach of duty, respectively (*DelCostello, id.* at 164–65, 103 S.Ct. 2281), in the interest of completeness, I will also address Plaintiff's arguments regarding the USS breach of contract issue.

### D. Breach of Contract by Defendant USS

Mr. Maksin claims that by posting the utilityman positions and then settling the grievances he subsequently filed in protest, Defendant USS violated the Basic Labor Agreement, the Overtime Agreement and what Plaintiff calls the "remanning" agreement.[7] Plaintiff claims that as

---

**5.** Compare to *Graphic Arts,* where the union representative not only arbitrarily rejected plaintiff's grievance at a union meeting, but then delayed the appeal for more than two months.

**6.** Plaintiff asserts in his Complaint that Local 2227 also breached its duty of fair representation by failing to adequately prepare for the grievance hearings and did not adequately investigate the facts relating to his grievances. (Compl.¶¶ 26–27.) These issues are not addressed in the Plf.'s Brief in Opp'n and are

therefore dismissed. In rebutting a motion for summary judgment, the non-moving party may not simply reiterate unsupported assertions, conclusory allegations or mere suspicious beliefs. *Liberty Lobby, id.* at 250–252, 106 S.Ct. 2505.

**7.** "Plaintiff also believes USS and Local 2227 posted the two utilityman positions in retaliation ... for filing grievances protesting USS's failure to honor the remanning and Overtime Distribution Agreement." (Plf.'s Brief at 3.) The postings were made on October 6, 1998.

a result, he was damaged by loss of overtime pay and benefits. (Compl.¶¶ 19–21.) I will consider each of these three documents in turn.

### 1. *The Basic Labor Agreement*

█ Defendants assert that the terms of the Basic Labor Agreement are unequivocal, meaning the terms therein are unambiguous. (USS Brief at 9.) Mr. Maksin does not raise any arguments to refute this assertion. Under Pennsylvania law, interpretation of unambiguous contracts is a matter of law, not a matter of fact for the jury. *Western United Life Assurance Co. v. Hayden,* 64 F.3d 833, 837 (3d Cir.1995), *citing Allegheny Int'l v. Allegheny Ludlum Steel Corp.,* 40 F.3d 1416, 1424 (3d Cir.1994) (where a written contract is "clear and unambiguous," the court construes the contract as a matter of law by its contents alone.)

Plaintiff argues that USS breached the BLA in that it failed to abide by the overtime provisions set out in Section 11. Assuming that Plaintiff is correct in asserting that this Agreement was the primary agreement between the Defendants governing overtime at the Irvin Plant, a thorough analysis of possible ambiguities in the pertinent language of the Agreement is required. *Allegheny Int'l, id.* at 1424–27. Within Section 11, there is no provision requiring that any employee of USS ever be scheduled to work overtime. In fact, the very first statement of that Section states that it "shall not be construed as a guarantee of hours of work per day or per week or a guarantee of days ·of work per week." (BLA at 91.) Furthermore, Section 10(H)(1) of the Agreement emphasizes that both the company and the

union agree that extended periods of overtime (such as that water plant employees experienced prior to the job postings) are undesirable. (*Id.* at 89.)

As a matter of law, USS cannot have breached any contractual obligations to the Plaintiff regarding dilution of overtime arising from the Basic Labor Agreement if there were no commitment by the company in that agreement to provide a certain amount of overtime. Plaintiff points to no specific language in the BLA which would assert an obligation by USS or a guarantee for himself or any other union employee regarding overtime. Furthermore, the Agreement requires that any amendment thereto must be in a writing signed by representatives of both the company and the union. (BLA, § 2(B)(5).) The union's International Officer whose signature is required for any agreement between USS–Irvin Plant and USWA Local 2227 has provided a sworn statement that there are no such additional agreements regarding overtime provisions. (Local Mem., Affidavit of Andrew V. Palm, ¶¶ 3–4.) Again, Plaintiff offers no evidence to rebut this statement. Therefore, on the evidence presented and my reading of the pertinent sections of the BLA, I must conclude that USS did not breach any contractual obligations to guarantee minimum overtime opportunities under the Basic Labor Agreement.

### 2. *Overtime Distribution Agreement*

█ As in the BLA analysis, I agree with Defendants that the terms of the Overtime Agreement are unambiguous. According to USS, the overtime distribution agreement was executed on November

---

On the record provided to date, Plaintiff and another utilityman had filed two grievances prior to the posting, both in August, 1998. Neither of them mentioned the remanning letter or Overtime Distribution Agreement.

The grievances filed after the postings *do* mention the two documents, however. Plaintiff does not explain how Defendants could have posted the positions in retaliation for something that Plaintiff had not yet done.

16, 1982 by USS and USWA for the explicit purpose of equalizing the opportunity for all employees within a given classification to accept overtime requests, regardless of their seniority. (USS Brief at 10.) My reading of the agreement confirms the USS position.

Clearly, the Overtime Agreement did not guarantee, mandate or promote overtime work. It sought only to distribute the work in an equal manner if overtime opportunities became available and to establish the record-keeping method by which overtime work would be calculated and equalized. (Overtime Agreement ¶¶ 3–6.) Mr. Maksin acknowledged that this was the purpose of the Agreement and stated that his interpretation of the agreement was to "keep the overtime equal and fair or try to keep it equal or fair within a reasonable amount of hours." (USS Brief at 10, quoting Plaintiff's Dep. at 79). I find that the Overtime Agreement between USS and the USWA did not create a legal right for Plaintiff to claim a minimal amount of overtime or to collect damages for not receiving overtime.

### 3. *"Remanning Agreement"*

Mr. Maksin claims USS also violated a "remanning agreement" by posting the utilityman positions, an assertion Defendants counter by arguing that the document is not a contract between USS and Local 2227 or the USWA and therefore does not control any actions by them. The document in question is a letter dated March 2, 1988, from J.J. McCluskey, Employment Relations Manager at the Irvin Plant, to E.C. Perkins, Secretary of the Basic Steel Industry Audit and Review Committee, an unidentified entity. Defendants assert that the only purpose of the letter was to clarify the position of USS on reductions and realignment of the workforce at the Irvin plant in 1988. The letter does not request, require or receive the endorsement of Local 2227 or USWA with the company's rationale for its decisions stated in the letter. Mr. Maksin agrees that this is nothing more than a response by McCluskey to an earlier letter and further admits it was not signed by or addressed .to any representative of Local 2227 or the USWA. (Maksin Dep. at 87–88.) On its face, the letter does not address any aspect of overtime and Plaintiff offers no explanation of how a letter which records the company's position on reclassification of certain positions and its refusal to post two vacancies in 1988 can be interpreted as obligating the company to provide a certain level of overtime to employees ten years later. I find that because the letter is not an agreement between USS and Local 2227 and, even if it were, because it does not address any overtime issues, it has no relevance to the overtime rights Mr. Maksin claims were denied him by USS.

In sum, reviewing all the evidence provided to date by both parties, I conclude that Plaintiff has failed to meet his burden of production in opposing the Motions for Summary Judgment. He has failed to demonstrate that there are genuine questions of material fact on any issue in this suit. In response to Defendants' Motions, Plaintiff has done little more than reiterate his original Complaint and has provided no depositions, affidavits or other evidence to substantiate those conclusory allegations.